537 F.Supp. 106 (1982)
CARSON-TRUCKEE WATER CONSERVANCY DISTRICT, Sierra Pacific Power Company, a corporation, and State of Nevada, Plaintiffs,
v.
James G. WATT, Secretary of Interior, et al., Defendants,
and
Pyramid Lake Paiute Tribe of Indians, Defendant-Intervenor.
No. CV-R-76-152-GJS.
United States District Court, D. Nevada.
February 16, 1982.
*107 John M. Collette, Andrew J. Ogilvie, Collette & Erickson, San Francisco, Cal., for plaintiffs Carson-Truckee Water Conservancy Dist. and Sierra Pacific Power Co.
John Madariaga, Susan L. Oldham, Reno, Nev., for plaintiff Sierra Pacific Power Co.
Richard H. Bryan, Atty. Gen., Larry D. Struve, Chief Deputy Atty. Gen., Harry W. Swainston, Deputy Atty. Gen., Carson City, Nev., Harold A. Swafford, John W. Hoffman, Matthew Feiertag, Bowen, Swafford & Hoffman, Reno, Nev., for plaintiff State of Nev.
Lamond R. Mills, U. S. Atty., Shirley A. Smith, Asst. U. S. Atty., Reno, Nev., Scott B. McElroy, Dept. of Justice, Land and Natural Resources Div., Washington, D. C., Joseph F. DePietro, Sacramento, Cal., for defendant Watt and U. S. agencies and officers.
Robert S. Pelcyger, Native American Rights Fund, Boulder, Colo., Michael R. Thorp, Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn, Tacoma, Wash., for defendant-intervenor Pyramid Lake Paiute Tribe of Indians.

OPINION
SOLOMON, District Judge:
This action arose out of a dispute over the waters of the Truckee River, which flows from the mountains of Eastern California through Stampede Dam and Reservoir (Stampede), and through Reno, Nevada. The Truckee empties into Pyramid Lake, which is surrounded by the Pyramid Lake Paiute Indian Reservation.
Plaintiffs Carson-Truckee Water Conservancy District (District) and Sierra Pacific Power Company (Sierra Pacific) seek to appropriate water from the lower Truckee River for Municipal and Industrial (M&I) uses. Plaintiffs contend that the Secretary *108 of the Interior and other federal defendants, by failing to obtain reimbursement for costs of constructing Stampede, violated the Washoe Project Act and related reclamation laws.
Stampede is part of the Washoe Reclamation Project (Project), which Congress authorized in 1956.[1] In 1958, Congress amended the Washoe Project Act to authorize increased construction costs and to add another dam to the Project.[2]
The District was formed in 1958 under Nevada law to act as the agency to purchase the water stored by the Washoe Project, as required under 43 U.S.C. § 485a(g). In 1965, before Stampede was constructed, the District and the United States entered into a contract to repay the United States for most of the Project costs in exchange for the delivery of water. The contract would become effective when the parties agreed to a supplemental contract (the "Stampede Addition") which would allocate the repayment costs of the Stampede Division. The Bureau of Reclamation (Bureau) recommended that the Secretary execute the Stampede Addition, but to date no Secretary has done it.
The parties contest the design and purposes of Stampede's operations. Under the Washoe Project Act, the Secretary controls the flow of the Truckee River by releases from Stampede. Plaintiffs assert that Congress intended the Project be used primarily for "reimbursable" reclamation functions such as irrigation, power generation, and municipal water supply. Stampede was completed in 1970 but the Secretary and Bureau have operated Stampede for only fishery experiments and the development of fish resources, both nonreimbursable functions.
Under the Act, the purposes of the Project were flood control, irrigation, storage against drought, power generation, development of fish and wildlife resources, and "other beneficial purposes." 43 U.S.C. § 614. The plaintiffs argue that M&I uses are included among its other purposes and that M&I uses are now the only potential source of income for the reimbursement requirements of the Washoe Project Act.
In an earlier proceeding in this case, Judge Harry Claiborne held that Congress intended the Project to be operated so that its construction costs would be substantially repaid. The estimated total cost of the original Project was 41 million dollars. Only eight million dollars of that cost was allocated to flood control, a nonreimbursable operation. Congress also provided a fish hatchery for the restoration of Pyramid Lake Fishery and for a small dam to regulate fish flows on the Truckee River. Congress also prohibited the Secretary from spending more than two million dollars for the development of fish and wildlife resources.
To ensure that a substantial part of the cost of the Project would be repaid, Congress directed the Secretary to enter into repayment contracts before delivering any Project water. 43 U.S.C. § 614a(c). When the original Project was planned, the demand for additional water was expected to come from the irrigation operations of its customers but the rapid growth of Reno and Sparks since the mid-1950's created an unexpected need for additional M&I water. The District asked the Bureau to study this need and to provide for it in the Definite Plan Report for the Project.
The Water Supply Act of 1958, 43 U.S.C. § 390b did not resolve the question whether the Secretary was authorized to use Stampede water for M&I purposes in the Reno-Sparks area. However, in 1963 the Solicitor's office advised the Bureau that M&I uses were authorized under the Washoe Project Act as one of the other beneficial purposes contemplated by the statute. 43 U.S.C. § 614.
In 1964, a special Department of Interior Task Force studied the feasibility of allocating project water for the maintenance of *109 fishery flows for certain species in Pyramid Lake which spawn along the bed of the Truckee River. The Task Force recommended that 16,900 acre-feet[3] of Stampede's annual yield be allocated to Nevada M&I use, 6,000 acre-feet to California M&I use, and 6,300 acre-feet to fishery uses, or a total of 29,200 acre-feet.
Shortly thereafter, the Definite Plan Report prepared by the Bureau provided that Stampede would supply 45,800 acre-feet for M&I purposes on a divertible basis, including 29,200 acre-feet on a depletable basis, for parts of the Truckee River basin in California, and for the Reno-Sparks area in Nevada.
In 1966, when the Bureau was about to start constructing Stampede, two developments threatened to delay construction. First, it appeared that a 1926 contract between the United States and the Truckee-Carson Irrigation District would have to be revised and approved by Congress before water from the Truckee could be diverted and distributed by the plaintiffs. Second, the Commissioner of the Bureau of Indian Affairs informed the Secretary that the Project did not provide adequate safeguards to protect the Pyramid Lake Indians' interest in preserving the lake and its fishery. The Tribe had withdrawn an initial objection to the Washoe Project when the Secretary assured the Tribe that 215,000 acre-feet of water would enter Pyramid Lake once the Project was operating. Studies completed in 1966 did not support this estimate.
Without executing a contract with the District, the Secretary commenced construction because he concluded that there was an immediate need for flood control protection for both the Boca Dam and the Reno-Sparks area. The Secretary directed that until the water rights problems were resolved, the dam and the reservoir would be used for flood control, fish and wildlife benefits, and recreation.
In 1967, the Secretary declared the cui-ui fish population of Pyramid Lake an endangered species. 32 Fed.Reg. 4001 (1967). In 1975, the Lahontan cutthroat trout, which had already been declared to be an endangered species, was declared to be threatened with extinction. 40 Fed.Reg. 29863 (1975). This action was taken because the reduced flow of water resulting from the diversion of water at the Derby Dam had eliminated much of its spawning run.
In 1969, the Secretary notified the District that he no longer intended to operate Stampede for M&I purposes and that until legal rights to the water were settled he would operate it only for "flood control, recreation, and fish and wildlife benefits. ..."
In United States v. Truckee-Carson Irrigation District, et al., No. R-2987-JBA (D.Nev.1977), (U.S. v. T.C.I.D.) the district court rejected the demand of the government for reserved water rights for the Pyramid Lake Paiute Indians for fishery purposes. On appeal, this holding was partly reversed and the case was remanded to the district court for further proceedings. 649 F.2d 1286 (1981). The defendants in this case contend that U.S. v. T.C.I.D. may have a collateral estoppel effect on the water rights to be considered here.
This case raises a number of issues. In the first phase, I shall consider those issues that require no factual findings. They are:
(1) Do plaintiffs have standing to challenge the Secretary's action?
(2) Do the plaintiffs have a private right of action under the reclamation laws?
(3) Is the government required to obtain a reimbursement contract? If so, can reimbursement be achieved through a contract to supply M&I water to the District?
(4) Is the state of Nevada entitled to a declaratory judgment on the issue of whether the Secretary's present operations of Stampede require a permit from the Nevada State Engineer?

*110 I. STANDING
The defendants contend that plaintiffs Sierra Pacific and the District lack standing to challenge the Secretary's operations of Stampede because: (1) the plaintiffs cannot show that they have suffered actual or threatened injury as a result of the Secretary's conduct, which injury would be redressed by a favorable decision, Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); and (2) plaintiffs are not members of the class for which the reimbursement provisions of the reclamation laws are designed to benefit. Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975).
To satisfy the first requirement, the plaintiff's interest in the outcome of the action must be unique or special; a simple taxpayer's interest in the lawful use of his revenues is insufficient. United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). The plaintiff's interest may not be "shared in substantially equal measure by all or a large class of citizens." Warth v. Seldin, 422 U.S. at 499, 95 S.Ct. at 2205.
The Secretary is under no obligation to contract with a particular entity for the distribution of reclamation water, and in theory may contract with any organization which satisfies the requirements under the reclamation laws. Here, there are no other entities in the Truckee Meadows area seeking the right to distribute Stampede water. The District was created for the express purpose of buying this water from the Stampede Reservoir. Therefore, the injury is sufficiently specific to trigger standing.
In Bryant v. Yellen, 447 U.S. 352, 367, 100 S.Ct. 2232, 2240, 65 L.Ed.2d 184 (1980), the Secretary of the Interior sued the Imperial Irrigation District to enforce an "excess lands" provision. This provision limits each recipient of federal reclamation water to a maximum of 160 acres of land, and requires the owners of larger parcels to sell excess lands at below-market prices. The District Court held against the Secretary, and the Secretary decided not to appeal. Imperial Valley residents sought leave to intervene for the purpose of appeal. The Supreme Court held that the residents had standing to appeal, based upon their allegations that (a) the plaintiffs lived in the Valley, (b) they were farm workers who did not own farmland, (c) they desired to purchase excess lands irrigated with reclamation water, and (d) those excess lands would have been sold at below-market prices.
The Washoe Project was designed to develop scarce water resources to be sold to water users in the area. The Secretary has refused to sell the Project's water, which the plaintiffs want to buy. A judgment ordering the Secretary to seek repayment contracts will almost certainly benefit the plaintiffs because they are the only entities in the area with the ability to purchase the water. Their claim of a particularized injury is stronger than that of the plaintiffs in Yellen, and is sufficient to give them standing to maintain this action.
I therefore hold that plaintiffs have standing to maintain this action.

II.

PRIVATE RIGHT OF ACTION UNDER THE RECLAMATION LAWS
Defendants contend that even if plaintiffs satisfy the standing requirements, the reclamation laws that govern the Secretary's actions are not enforceable by private parties. Plaintiffs assert that under the Administrative Procedure Act, 5 U.S.C. § 702 (1976), private parties may enforce the Secretary's obligation to obtain partial reimbursement for the construction costs of Stampede. Plaintiffs also assert that the courts have the authority to compel the Secretary to comply with the reimbursement obligation.
Reclamation funds are proceeds of public lands which are reinvested to construct projects that are too expensive for private interests or states to finance. Swigart v. Baker, 229 U.S. 187, 197, 33 S.Ct. 645, 647, 57 L.Ed. 1143 (1913). Reclamation funds *111 are continually reinvested for projects which eventually pay for themselves. The Reclamation Project Act of 1939, 43 U.S.C. § 485h (1976), set out procedures which the Secretary must follow to obtain authorization for new projects. Section 485h(a) prohibits expenditures for any new project unless the Secretary has submitted to Congress a feasibility report which includes estimates of the project cost and the portion to be paid by water users. When probable repayments exceed costs, the project is automatically authorized. But when expected payments fall short of project costs, the Secretary cannot proceed without specific Congressional authorization.
The Washoe Project Act incorporates the overall Congressional plan for the Truckee and Carson Rivers. The Project was originally designed to be 86% reimbursable, and was primarily intended to benefit water users in the area. Section 2(c) of the Act requires the Secretary to obtain repayment contracts before delivering any water.[4] 43 U.S.C. § 614a(c) (1976). Other sections of the Act limit the Secretary's authorization to build recreation or fish and wildlife facilities. 43 U.S.C. §§ 614b, 614c (1976). Congress intended that the Secretary obtain repayment for the costs of the Project, except for amounts specifically allocated to nonreimbursable functions. The committees which studied the Project assumed that water users would repay most of the Project's cost, and the legislative history of the Washoe Project Act supports this view.
Federal courts may review the Secretary's actions to ensure that he exercises his authority over federal waters within the statutory constraints. Arizona v. California, 373 U.S. 546, 584-5, 590, 83 S.Ct. 1468, 1489-90, 1492, 10 L.Ed.2d 542 (1963). In Arizona Power Pooling Association v. Morton, 527 F.2d 721 (9th Cir. 1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), an association of consumer-owned utilities brought an action to compel the Secretary to sell them surplus power from the Central Arizona Project. The reclamation laws required the Secretary to give preference to municipalities and public corporations for power sales. 43 U.S.C. § 485h(c). Instead, the Secretary sold the power to private companies. The Ninth Circuit held that the Secretary did not have unfettered discretion to operate the project, and that the Secretary could not disregard the preference provision unless the preference would impair the efficiency of the project for irrigation purposes.
The court in Arizona Power Pooling reviewed the Secretary's actions under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (1976). Section 702 grants a right of judicial review to any person adversely affected or injured by agency action, except when (a) the statute itself expressly precludes judicial review, or (b) "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1976).
The defendants here contend that exception (b) applies because the Secretary has wide discretion in carrying out reclamation operations. To restrict judicial review requires "clear and convincing evidence" of legislative intent. Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). In Arizona Power Pooling, supra, 527 F.2d at 727, the court stated:
[T]he "committed to agency discretion" exception is a very narrow one which is applicable only in "those rare instances where `statutes are drawn in such broad terms that in a given case there is no law to apply.'" [Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).]
Here, the reimbursement provision restricts the Secretary's authority. Without judicial review, there is no mechanism to enforce Congressional instructions. See City of Santa Clara, Cal. v. Andrus, 572 *112 F.2d 660, 666 (9th Cir. 1978); cf. Arizona Power Authority v. Morton, 549 F.2d 1231 (9th Cir. 1977), cert. denied, 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (review denied because broad statutory grant of discretion brought Secretary's actions within the agency discretion exception).
I hold that plaintiffs have a private right of action under the reclamation laws.

III.

AUTHORIZATION TO SELL WATER FOR M&I USES
Defendant-intervenor Pyramid Lake Paiute Tribe of Indians denies that the Secretary has an obligation to obtain reimbursement for the costs of Stampede. The Tribe also contends that the Secretary is not authorized to sell Stampede water for M&I uses. The Tribe bases its argument on the legislative history of the Washoe Project Act.
The Washoe Project Act does not mention M&I uses, but it does authorize the use of Stampede water for irrigation, drainage, storage, flood control, hydroelectric power, fish and wildlife, and "other beneficial purposes." 43 U.S.C. § 614. The Tribe argues that in spite of this broad language, Congress in 1955 specifically considered and rejected M&I water for Reno and Sparks. This contention is based on the feasibility report,[5] which permitted M&I water for other communities in the area. I question this conclusion because another passage of the report assumed that the population of Reno and Sparks, which now exceeds 140,000, would reach only 70,000 by the year 2000.
The need for more M&I water became apparent a few years after the enactment of the Washoe Project Act. The Bureau studied that need and concluded that the Definite Plan Report for Stampede authorized M&I uses. In 1963, the Bureau's Solicitor came to the same conclusion. In 1964, a special task force of the Interior Department recommended that Stampede water be sold for M&I uses. These interpretations by the agency charged with the administration of a project are entitled to deference. California v. United States, 438 U.S. 645, 676 n.30, 98 S.Ct. 2985, 3001 n.30, 57 L.Ed.2d 1018 (1977); United States v. Gerlach Live Stock Co., 339 U.S. 725, 735-6, 70 S.Ct. 955, 960-61, 94 L.Ed. 1231 (1949).
The Tribe also contends that the Water Supply Act of 1958, 43 U.S.C. § 390b(d), requires the Secretary to obtain Congressional approval before selling Stampede water for M&I uses. That Act prohibits modifications "which would seriously affect the purposes for which the project was authorized," unless Congress approves. The Tribe's argument assumes that M&I uses were not authorized by the Washoe Project Act, an assumption which I have already rejected.
The Secretary originally agreed with the Tribe; however, he now concedes that he is obligated to obtain reimbursement for the costs of Stampede, and that he is authorized to sell Stampede water for M&I uses. Nevertheless, the Secretary asserts that the District cannot compel the sale of M&I water without his determining the amount of water needed to satisfy the other purposes of the Washoe Project, or until the Tribe's water rights are settled and the endangered species are adequately protected. I have reserved decision on the effect of these rights and obligations for phase two of this litigation.
The Secretary also asserts that he may operate Stampede as he deems appropriate until Congress enacts new legislation. This litigation is primarily the result of the Secretary's failure to sign the Stampede Addition. Congressional hearings indicate that legislators are awaiting the decisions in this and related cases before enacting new legislation. Finally, the Secretary may not refuse to obtain repayment now merely because future events may provide other and even preferable sources of repayment.
*113 Plaintiffs seek a judgment directing the Secretary to execute the Stampede Addition to the Repayment Contract. Events since 1966 may have rendered the terms of that contract inappropriate. I therefore hold that the Secretary is obligated to sell all of the Stampede waters not required to fulfill his obligations under the Endangered Species Act and the Tribe's reserve water rights.

IV.

STATE WATER APPROPRIATION PERMITS
The State of Nevada seeks a declaration requiring the Secretary to obtain a permit from the Nevada State Engineer for Stampede's present operations. The State of California has issued two permits that authorize the storage of the Little Truckee River waters at Stampede. These waters are now captured, impounded, and released in California. None of this water is diverted from the natural channel of the Truckee River in Nevada.
In 1968, the Secretary applied to the Nevada State Engineer for a permit to appropriate water for M&I, irrigation, and fish and wildlife purposes. Because the amount of water which would be appropriated for each use was uncertain, the Nevada State Engineer deferred action on these applications. These applications have not yet been granted or denied.
Section 533.325 of the Nevada Revised Statutes (NRS) provides that all persons who appropriate water in the State of Nevada for beneficial purposes must obtain water permits from the Nevada State Engineer. "Persons" is defined to include the United States. NRS 533.010.
In California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), the Supreme Court held that the United States was required to obtain permits from the State of California to operate a federal reclamation project and to comply with all conditions imposed by the State which are consistent with Congressional directives. Id. at 676, 98 S.Ct. at 3001.
The Secretary concedes that a permit is necessary in order to divert water for M&I or irrigation purposes in the State of Nevada. However, the Secretary points out that none of the Bureau's present activities take place in Nevada. The Bureau releases water in California which flows into Nevada and empties into Pyramid Lake. There is no diversion or appropriation of water as those terms are commonly understood. Section 533.335(5) of the Nevada Revised Statutes supports this interpretation. That section requires a permit application to provide "a substantially accurate description of the location of the place at which the water is to be diverted from its source. And, if any water is to be returned to the source, ... a description of the location of the place of return." Here, no water is diverted from its natural channel, and no diverted water is returned, so there can be no locations to describe, as required by this section. This interpretation is also supported by NRS 533.445, which provides that a reservoir manager need only give notice to the State Engineer when he intends to use the bed of a stream to carry stored water.
I hold that under Nevada law, "appropriation" means an actual diversion from the source, and therefore no permit is required for Stampede's present operations.

V.

CONCLUSIONS
I hold that the plaintiffs have standing to maintain this action, and that they have a private right of action under the Administrative Procedure Act to enforce the Secretary's reimbursement obligation. The Secretary is required to sell all of Stampede's water except that which is necessary to fulfill his trust obligations to the Tribe and to protect the endangered species which spawn in the Lower Truckee River.
I also hold that the Secretary needs no permit from the State of Nevada for Stampede's present operations.
NOTES
[1] Pub.L.No.84-858, 70 Stat. 775 (codified at 43 U.S.C. §§ 614-614d (1956) (Washoe Project Act).
[2] Pub.L.No.85-706, 72 Stat. 705 (codified at 43 U.S.C. § 614d (1958).
[3] An acre-foot is a unit used to measure water storage; it means the amount of water contained by a one-acre surface area one foot deep.
[4] Section 2(c), codified at 43 U.S.C. § 614a(c), provides:

[T]he Secretary, prior to the delivery of project water supplies, shall have entered into a contract or contracts with an organization or organizations as defined in section 485a(g) of this title, which have the capacity to levy assessments upon all taxable real property located within their boundaries to assist in making repayments.
[5] The feasibility report is incorporated into the legislative history of the Washoe Project Act as H.R.Doc.No.181, 84th Cong., 1st Sess. (1955).