CARSON–TRUCKEE WATER CONSERVANCY DISTRICT, Sierra Pacific Power Company, a corporation, and State of Nevada, Plaintiffs,

v.

James G. WATT, Secretary of the Interior, et al., Defendants,

and

Pyramid Lake Paiute Tribe of Indians, Defendant-Intervenor.

No. CV–R–76–152–GJS.

United States District Court, D. Nevada.

Oct. 4, 1982.

John M. Collette, Andrew J. Ogilvie, Collette & Erickson, San Francisco, Cal., for plaintiffs Carson-Truckee Water Conservancy Dist. and Sierra Pacific Power Co.

John Madariaga, Susan L. Oldham, Reno, Nev., for plaintiff Sierra Pacific Power Co.

Richard H. Bryan, Atty. Gen., Larry D. Struve, Chief Deputy Atty. Gen., Harry W. Swainston, Deputy Atty. Gen., Carson City, Nev., Harold A. Swafford, John W. Hoffman, Matthew Feiertag, Bowen, Swafford & Hoffman, Reno, Nev., for plaintiff State of Nev.

Lamond R. Mills, U.S. Atty., Shirley A. Smith, Asst. U.S. Atty., Reno, Nev., Rembert A. Gaddy, Dale T. White, Dept. of Justice, Land & Natural Resources Div., Brenda Washington, U.S. Dept. of Interior, Office of the Solicitor, Washington D.C., for defendant James Watt and U.S. Agencies and Officers.

Robert S. Pelcyger, Fredericks & Pelcyger, Boulder, Colo., Michael Thorp, Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn, Tacoma, Wash., E. Pierre Gezelin, Reno, Nev., for defendant-intervenor Pyramid Lake Paiute Tribe of Indians.

## OPINION

SOLOMON, District Judge:

This is an action to compel the defendant, the Secretary of the Interior (Secretary) to store water in the Stampede Reservoir for the benefit of plaintiffs, and to compel the Secretary to enter into a contract with plaintiffs for plaintiffs to reimburse the United States government (government) for the costs of the Stampede Dam and Reservoir (Stampede).

Carson-Truckee Water Conservancy District, Sierra Pacific Power Company, and

706

the State of Nevada, plaintiffs, filed this action against the Secretary and several bureau chiefs in the Department of Interior. The Pyramid Lake Paiute Tribe of Indians (Tribe) intervened as a defendant.

Stampede Dam was completed in 1970. Since that time, the Secretary and the Bureau of Reclamation have operated Stampede only for fishery development, flood control, and recreation. Plaintiffs contend that under the Washoe Project Act,[1] the Secretary is required to operate Stampede for reimbursible reclamation purposes such as irrigation, power generation, and municipal water supply.

In an earlier opinion,[2] I held that (1) the plaintiffs have standing to maintain this action, (2) plaintiffs have a private right to action under the Administrative Procedure Act, 5 U.S.C. § 702, to enforce the Secretary's obligation to obtain reimbursement for the construction costs of Stampede, (3) the Secretary must sell all of Stampede's water except the amount necessary to fulfill his trust obligations to the Tribe and to protect the endangered and threatened species which spawn in the Lower Truckee River, and (4) under Nevada law, the Secretary needs no permit from the Nevada State Engineer for Stampede's present operations. I reserved decision on the amount of water which the Secretary must provide (1) to satisfy his obligations under the Endangered Species Act[3] to conserve the endangered and threatened species of Pyramid Lake, and (2) to satisfy his trust obligations to preserve the Pyramid Lake fishery for the benefit of the Tribe.

## I.

### FACTS AND PROCEDURAL HISTORY

The Little Truckee River flows from the mountains of eastern California, through the Stampede Dam and Reservoir and Boca Dam, where it joins the Truckee River. The Truckee River flows into Nevada through Reno and Sparks, and empties into Pyramid Lake.

Pyramid Lake is surrounded by the Pyramid Lake Paiute Indian Reservation. The reservation consists of 322,000 acres which was set aside in 1859, and confirmed by executive order in 1874. One of the purposes of the reservation was to enable the Tribe to take advantage of the Pyramid Lake fishery, which among other things includes a native species of cutthroat trout, and the cui-ui fish, which exists nowhere else.

In 1902, Congress passed the Reclamation Act. The Secretary then withdrew land for the Newlands Reclamation Project. Most of the land was in the Carson River basin in Nevada. The Newlands Project was designed to divert water from both the Carson and Truckee Rivers for irrigation and storage.

The government claimed the right to all unappropriated water in the Truckee River, and constructed the Derby Dam on the lower Truckee River to divert water from that river below Reno into the Lahontan Reservoir.

In 1913, the government filed an action, *United States v. Orr Water Ditch Co., et al.,* against all water users along the Truckee River to quiet title to the water rights of all parties. The government claimed a small amount of water to irrigate lands on the Pyramid Lake Reservation, and claimed the rest of the water for the Newlands Project. The government did not claim water for the Pyramid Lake Fishery.

After the *Orr Ditch* decree was entered, the government contracted with the Truckee-Carson Irrigation District (TCID) to provide water for the Newlands project. Soon thereafter the level of the Lake began to

---

1. Pub.L. 84–858, 70 Stat. 775 (1956) (codified at 43 U.S.C. §§ 614–614d).

2. *Carson-Truckee Water Conservancy District, et al. v. Watt and Pyramid Lake Paiute Tribe of Indians,* 537 F.Supp. 106 (D.Nev.1982).

3. Pub.L. 93–205, 87 Stat. 884 (1973) (codified at

drop,[4] and a delta was exposed at the mouth of the Truckee River which in most years was too shallow for the fish to pass upstream to their spawning grounds. Another problem related to the temperature of the water. Lahontan cutthroat trout require cooler water for spawning, available only above the Derby Dam. The Dam had a fish ladder, but it did not work well, and it eventually collapsed.

By 1938, the level of the Lake dropped 40 feet. Soon thereafter the cutthroat trout became extinct. By spawning along the edges of the Lake where the fresh Truckee River water entered, the cui-ui barely survived.

In the 1940's the State of Nevada began to stock the Lake with cutthroat trout from nearby lakes and rivers.[5] In 1956, Congress appropriated funds to restore the fishery under the Washoe Project Act. That Act also provided for the construction of Stampede Dam for flood control, irrigation, power generation, development of fish and wildlife resources, storage against drought, and "other beneficial purposes", 43 U.S.C. § 614, including Municipal and Industrial (M & I) uses.

Disputes over water rights on the Truckee River delayed the construction of Stampede. Finally, in 1970, it was built because of an immediate need for flood control protection for the Reno-Sparks area.

In 1967, the Secretary declared the cui-ui fish population of Pyramid Lake an endangered species. 32 Fed.Reg. 4001 (1967). In

1975, the Secretary declared the Lahontan cutthroat trout to be "threatened with extinction". 40 Fed.Reg. 29863 (1975).

In 1976, the Marble Bluff Dam and Fishway were completed. This fishway enables fish to bypass the delta and reach their spawning grounds. Releases of water from Stampede have not only helped provide the flows for the fishway, but have also provided cooler temperatures needed to trigger the spawning instinct.[6]

In *United States v. Truckee-Carson Irrigation District, et al.,* No. R–2987–JBA (D.Nev.1977) (*T.C.I.D.*), the district court rejected the government's demand for reserved water rights for the Tribe's fishery. On appeal, this holding was partly reversed and the case was remanded. 649 F.2d 1286 (1981). The Court of Appeals held that (1) the Reclamation Act of 1902 did not authorize the Secretary to take Indian reserved water rights and use them to benefit the Newlands Project, 649 F.2d at 1298, (2) the *Orr Ditch* defendants and subsequent appropriators who relied upon the *Orr Ditch* decree could assert a defense of res judicata against T.C.I.D. and the Tribe, who were represented by the government, and (3) the Tribe was not precluded by res judicata from asserting rights against T.C.I.D., because the government did not adequately represent the interests of the Tribe in the *Orr Ditch* case.

The water right at issue in *T.C.I.D.* is vast,[7] and any water the Tribe is awarded

16 U.S.C. §§ 1531–1543), as amended.

**4.** Pyramid Lake loses approximately four feet per year, or 440,000 acre-feet, through evaporation and seepage. It receives approximately 55,000 acre-feet per year in precipitation and run-off from small streams, and the rest from the Truckee River. Water diverted for irrigation in the Newlands Project does not return to the river, unlike the water diverted above the Derby Dam.

**5.** The genetic composition of the original Pyramid Lake cutthroat trout is unknown. However, from 1890 to 1932 hundreds of millions of eggs were taken from the Pyramid Lake trout and used for stocking streams and lakes in Nevada and other states. It is probable that descendants of these fish were used to restock Pyramid Lake. Expert testimony indicates that

the trout now living in Pyramid Lake are genetically similar to the original population.

**6.** The water temperature problem was aggravated in the 1940's when the Army Corps of Engineers removed a riparian shade canopy which grew along the banks of the lower Truckee River. Since 1970, the Secretary has been releasing Stampede water only during the spawning season (roughly, mid-March through June), in order to keep the water in the lower Truckee River cool enough for the fish to spawn there.

**7.** The Newlands Project was given the rights to sufficient water to irrigate 232,000 acres of land assuming 3.5 acre-feet of water per acre of land, plus water lost in transportation. In comparison, the total storage capacity of Stampede

on remand in *T.C.I.D.* may substantially diminish the amount of water required to satisfy the Tribe's claims here.

The parties disagree on whether the Court in *T.C.I.D.* expanded the amount of water which the government may claim from subsequent appropriators. Even if the amount of water is expanded, there is no overlap of issues which might cause collateral estoppel problems here because (1) plaintiff Carson-Truckee Water Conservancy District (Carson-Truckee) was not a party in *T.C.I.D.*, and (2) if the Tribe wins on remand in *T.C.I.D.*, there may be less water available for Stampede storage, but it will not affect the Secretary's obligation to store and sell to plaintiffs any water remaining after the *T.C.I.D.* obligations have been satisfied.

## II.

### ISSUES

The plaintiffs do not deny that the Secretary has obligations to the Tribe and under the Endangered Species Act which take precedence over his obligation to store water for municipal and industrial (M & I) use. However, plaintiffs contend that the amount of water necessary to fulfill those obligations is small, and that there is sufficient water for M & I storage after the water requirements under the Endangered Species Act have been satisfied.

The government and the Tribe contend that the Endangered Species Act requires the government to supply the fishery with sufficient water to get the species off the threatened and endangered lists. They contend that this goal requires more water than the entire yield of the Stampede Reservoir.

The government and the Tribe also contend that the plaintiffs already have enough water from other sources, and that they do not need any more water from Stampede. They also contend that the relief which plaintiffs seek is precluded by

Reservoir is only 225,000 acre-feet. Currently, only 65,000 acres of the Newlands Project are

(1) the Secretary's trust obligations to the Tribe, which is an issue also present in *T.C.I.D.*,

(2) the Secretary's failure to conduct a consultation as required by 16 U.S.C. § 1536,

(3) the absence of an Environmental Impact Statement, and

(4) the plaintiffs' lack of a Nevada water appropriation permit.

## III.

### THE ENDANGERED SPECIES ACT

Section 2(c) of the Endangered Species Act, 16 U.S.C. § 1531(c), requires that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."

Section 2(b) of the Act, 16 U.S.C. § 1531(b), states in part:

> (b) The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species, . . .

The term "conserve" is defined in Section 3(2) of the Act, 16 U.S.C. § 1532(2):

> The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.

Plaintiffs contend that the Endangered Species Act does not prevent the Secretary from operating Stampede for M & I uses unless that operation would jeopardize the existence of the cui-ui fish and the Pyramid Lake Lahontan cutthroat trout. The defendants on the other hand contend that the Secretary has an obligation under the Act to replenish the species so that they are

being irrigated.

no longer endangered or threatened with extinction.

Specifically, the plaintiffs contend that: (1) the Secretary is only obligated to avoid jeopardizing the bare survival of the species, (2) the Secretary may refuse to store water for M & I use only if there is an "irresolvable conflict" between M & I storage and the bare survival of either species, and (3) the Secretary must use other available methods to conserve the fish in order to store more water for M & I use.

The plaintiffs rely on section 7(a)(2) of the Act, as amended, 16 U.S.C. § 1536(a)(2), which states in part:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, ... In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

Plaintiffs contend that this language permits federal agencies to supply only that amount of water necessary to prevent the extinction of endangered species. I disagree.

The Supreme Court has held that the Act gives endangered species the highest priority over all federal projects. In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Court enjoined the completion of the Tellico Dam in order to prevent the extinction of the snail darter fish, whose critical habitat would be destroyed by the dam. At the time the injunction was issued, the dam was almost completed, and the loss to taxpayers was estimated at more than 50 million dollars. The Supreme Court reviewed the legislative history of the Endangered Species Act, and concluded that Congress regarded

the value of endangered species to be "incalculable". *Id.* at 187, 98 S.Ct. at 2298. "The plain intent of Congress in enacting this statute was to halt *and reverse* the trend toward species extinction, whatever the cost." *Id.* at 184, 98 S.Ct. at 2296 (emphasis added). In enacting the Endangered Species Act, Congress has made "a conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185, 98 S.Ct. at 2297.

Both of the cases on which plaintiffs rely, namely, *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976) and *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir.1976), *rehearing denied,* 532 F.2d 1375, *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587, were decided before *T.V.A. v. Hill.* In *Sierra Club,* environmentalists sued to enjoin the construction of a dam which would flood some caves where an endangered species of bats lived. The district court denied relief, and the court of appeals affirmed. The evidence there showed that only a tiny part of the endangered bats might be affected. In *Coleman,* the court held that construction of a highway which would destroy only a tiny part of the critical habitat of the Sandhill Crane was permissible if it would not jeopardize the existence of that species. The court remanded for further findings on that question.

Even assuming that these decisions do not conflict with *T.V.A. v. Hill,* they do not apply here. In both cases, the district court found that the proposed agency action would not jeopardize the existence of an endangered species. In both cases after consultations with the Secretary as required by 16 U.S.C. § 1536, the agency decided to go ahead with the project.

Here, there is no proposed agency action and no consultation with the Secretary. There is substantial evidence that plaintiffs' proposal would jeopardize the existence of the species.

The defendants rely on *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167 (D.D.C. 1977) and *Connor v. Andrus,* 453 F.Supp.

1037 (W.D.Tex.1978). Both involve challenges to the Secretary's hunting regulations. The plaintiffs in *Defenders of Wildlife* successfully challenged regulations which permitted hunting during twilight hours, when endangered species of birds could not be distinguished from game species. In *Connor,* the court set aside the Secretary's regulation prohibiting all duck hunting because it was arbitrary. However, both cases held that:

> [The Secretary] must do far more than merely avoid the elimination of protected species. [He] must bring these species back from the brink so that they may be removed from the protected class, and [he] must use all methods necessary to do so.

*Defenders of Wildlife,* 428 F.Supp. at 170; *accord, Connors,* 453 F.Supp. at 1041.

■ In my view this standard applies under the Endangered Species Act, and the Secretary is required to give the Pyramid Lake fishery priority over all other purposes of Stampede until the cui-ui fish and Lahontan cutthroat trout are no longer classified as endangered or threatened.

## THE PYRAMID LAKE RESTORATION PROGRAM

■ The Secretary must store all water not required under the Endangered Species Act to conserve the Pyramid Lake fishery, but the amount of water available must be determined on the basis of the evidence. The Secretary's finding on the amount of water necessary for the fishery is entitled to deference. Under the Administrative Procedure Act, 5 U.S.C. § 706(2),[8] the standard of review is narrow. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If the Secretary acted within his statutory authority, the test is whether his action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

The Secretary is conducting a program to restore the cui-ui to a non-endangered status by developing a population which is self-sustaining through natural reproduction. He also seeks to restore the Pyramid Lake Lahontan cutthroat trout population to the point where it is no longer a threatened species. The timely release of water flows from Stampede are essential to this program.

■ Substantial evidence supports the Secretary's plan for operating Stampede.

### A. Water Requirements of the Cui-ui.

All the parties concede that the cui-ui are an endangered species, and that the cui-ui are important to science as the only pure species remaining in the genus Chasmistes.

Until recently, little was known about the life-cycle of the cui-ui. The spawning population appears at the river delta and fishway between mid-March and mid-April, depending on the volume of water entering the Lake. Upstream migration begins in May and lasts until mid-June, if the flows are sufficient. Unlike other species, the

**8.** 5 U.S.C. § 706 states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

cui-ui do not die after spawning; they return to the Lake. Their eggs hatch in one to two weeks, depending on the water temperatures. Even the experts do not know the amount of time that the larval cui-ui spend in the river before returning to Pyramid Lake.

The temperatures in the River depend on the flow—the greater the volume during the spawning season, the lower the temperatures. The cui-ui restoration program requires large flows during the spawning season for three reasons:

(1) Large flows attract the spawning population to the mouth of the Pyramid Lake fishway, where they are captured for the Tribe's cui-ui hatchery. If the flows are not maintained over a period of several weeks before migration, the spawners will disperse and reabsorb their eggs.

(2) The cooler the river temperatures, the higher the migration, hatching, and survival rates of the larval cui-ui.[9]

(3) Without adequate water depth the spawners and larval cui-ui may be stranded in the river and die before they return to Pyramid Lake.

*B. Water Requirements of the Lahontan Cutthroat Trout*

The Lahontan cutthroat trout cannot spawn naturally in the Truckee River because they require lower temperatures and faster currents than the cui-ui. Their natural spawning grounds are inaccessible because the trout migration is blocked by the Derby Dam.

Like the cui-ui, the trout do not die after spawning. The young trout remain in the river for up to two years before returning to Pyramid Lake.

Access to the upper Truckee River is now blocked; therefore the trout population is being sustained by several hatcheries. The trout are captured in the fishway, to insure

that only fish who attempt to migrate will reproduce. Large quantities of cool water are necessary to attract the spawners into the fishway.

I find that the releases of water from the Stampede Reservoir are necessary for the hatcheries to produce spawning Lahontan cutthroat trout that are adapted to their environment.

## PLAINTIFFS' PROPOSAL FOR OPERATING STAMPEDE

For plaintiffs to be able to serve new M & I users, they must have enough water in storage to insure a steady supply in drought years. The plaintiffs' plan would require the release of M & I water in small quantities, and most of the total annual M & I releases would occur outside the spawning season, when it would not help increase the fish population.

Water releases for the fishery in a single year may require all of the Stampede storage, leaving no reserve for M & I users in drought years. In my view, it is not feasible to operate Stampede for both M & I and fishery purposes.

Plaintiffs concede that it is unlikely that the fish population of Pyramid Lake will increase substantially under their proposal for operating Stampede. The plaintiffs' plan would reduce the average river flow during the spawning season 20% below the level which existed before Stampede was built. This amount is inadequate to meet the Secretary's obligation under the Endangered Species Act. Before Stampede was built, there was not enough water for the cui-ui, and the cui-ui were practically extinct. The plaintiffs' proposal does not meet their own standards because it would jeopardize the existence of the cui-ui and hasten their extinction.

**9.** In warmer temperatures the fish are more susceptible to disease and the eggs are susceptible to fungus. Studies conducted by Dr. David Koch, one of the defendants' experts, show that the ideal temperature for larval cui-ui survival is 57 degrees. Although the design of his experiment did not duplicate natural conditions, the evidence showed that the plaintiffs' proposal to maintain a river temperature of approximately 68 degrees would permit only a small percentage of cui-ui to survive.

## OTHER CONTENTIONS

### A. Consultation Requirements

The plaintiffs are proposing a plan which would modify the critical spawning habitat of the cui-ui and the Lahontan cutthroat trout. The defendants point out that even if the Secretary was willing to adopt this plan, he could not do it without first satisfying the consultation procedures in 16 U.S.C. § 1536. That section requires the Secretary to provide an opinion showing what effect his proposed plan of action would have on the species or habitat, to insure that it "is not likely to jeopardize the continued existence of any endangered species or threatened species."

There was no consultation here because there was no proposed agency action. I know of no authority authorizing a court to order a federal agency to take action affecting an endangered species without first satisfying the consultation requirements.

### B. Lake Level Requirements and Conservation Methods

The defendants contend that Pyramid Lake must be maintained at its present level to prevent the concentration of total dissolved solids from making the Lake uninhabitable for fish. Defendants also contend that the plaintiffs can meet their anticipated water needs through conservation and other sources.

It is not necessary to consider these contentions, because I have held that the Secretary's operation of Stampede for the benefit of the endangered and threatened species of Pyramid Lake is not an abuse of discretion. Nevertheless, I note that these additional contentions are without merit. Under the plaintiffs' proposal, the average annual volume of water entering Pyramid Lake would be about the same,[10] even though the water would enter at different times. The plaintiffs' water needs are irrelevant because I have already held that the Washoe Project Act created an enforceable

obligation on the part of the Secretary to obtain reimbursement for the construction costs of Stampede, and this obligation is superseded only by the Endangered Species Act and the Tribe's fishery rights.

Similarly, there is no merit in plaintiffs' contention that the Secretary must use other available methods to conserve the fish which would permit more water to be stored for the plaintiffs' benefit. These methods would include the restoration of a riparian shade canopy along the river below the Derby Dam, the confinement of the River to a single channel, the transplantation of the cui-ui to a different habitat, and the construction of more hatcheries. Plaintiffs failed to produce evidence to show the feasibility or cost of these projects.

■ I find it was plaintiffs' burden to show the Secretary has abused his discretion. Plaintiffs seek to enforce the reimbursement provisions of the Washoe Project Act. Yet their proposal may require the Secretary to spend huge sums to conserve the fish, in order to sell them extra water. This proposal could very well defeat the purpose of the Act's reimbursement provisions, which is to maintain a large reclamation fund for continuous reinvestment in new projects.

I find that the plaintiffs have failed to show that the Secretary is abusing his discretion.

## IV.

### TRUST OBLIGATIONS TO THE TRIBE

In T.C.I.D., the court held that one of the purposes of establishing the Pyramid Lake Reservation in 1859 was "to enable the Tribe to take advantage of the Pyramid Lake fishery, then consisting of a native species of cutthroat trout, and the cui-ui, ..." T.C.I.D., supra, 649 F.2d at 1290.

The amount of water necessary to satisfy the Tribe's fishery rights is disputed both in T.C.I.D. and in this case. The Tribe elected

---

**10.** Plaintiffs estimate that under their proposed plan, only 11,000 acre-feet per year would be lost from the system through M & I use. The rest would return to the Truckee River. Pyra-mid Lake requires approximately 385,000 acre-feet from the Truckee River to maintain a constant level.

not to present any evidence on this issue, but urges this court to allow the Secretary to use Stampede for the benefit of the fishery until the final judgment in *T.C.I.D.* determines the Tribe's rights.[11] The plaintiffs oppose the Tribe's request and seek an order requiring the Secretary to sell them water now on the ground that they would be entitled to the same percentage of any remaining storage in Stampede regardless of the holding in *T.C.I.D.*

In my view it is premature for me to determine this issue before *T.C.I.D.* is decided. Because I am holding that the Endangered Species Act requires the Secretary to use Stampede for the fishery, Stampede storage will not be available for M & I uses until the cui-ui and Lahontan cutthroat trout are no longer threatened or endangered. This may take many years. The fishery rights at issue here are intimately connected with issues that must be decided in *T.C.I.D.*, a case which has many parties including all of the parties in this case other than Carson-Truckee Water Conservancy District. Until *T.C.I.D.* is decided, the Secretary's trust obligations to the Tribe will not be known.

## V.

### OTHER ISSUES

I do not reach the question whether the Secretary requires an Environmental Impact Statement to enter into a repayment contract because I am holding that the Secretary is properly operating Stampede to conserve the threatened and endangered species of Pyramid Lake. I also do not reach the question whether the plaintiffs may claim rights as "subsequent appropriators" under the *T.C.I.D.* decision, because I will abstain from determining the Tribe's reserved fishery rights.

## VI.

### CONCLUSION

All of the claims asserted by the plaintiffs are denied and the Secretary is enti-

tled to a judgment dismissing plaintiffs' action and holding that his operation of Stampede for the benefit of the Pyramid Lake cui-ui fish and the Lahontan cutthroat trout is reasonable and proper and does not constitute an abuse of discretion.

11. The pretrial order in this case barely mentioned the trust obligations, because at the time the pretrial order was entered, the Ninth Cir-

cuit had not yet overturned the district court's holding that the Reclamation Act extinguished the Tribe's fishery rights.