741 F.2d 257
 21 ERC 2111, 14 Envtl. L. Rep. 20,797
 CARSON-TRUCKEE WATER CONSERVANCY DISTRICT, Sierra Pacific
Power Company, and the State of Nevada,
Plaintiffs-Appellants, Cross-Appellees,
v.
William P. CLARK, Secretary of the Interior, et al.,
Defendants-Appellees,
and
Pyramid Lake Paiute Tribe of Indians,
Defendant-Intervenor-Appellee, Cross-Appellant.
 Nos. 83-1549, 83-1562, 83-1603 and 83-1714.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 15, 1983.
Decided Aug. 22, 1984.
 
 John M. Collette, Collette & Erickson, Andrew J. Ogilvie, San Francisco, Cal., for Sierra Pacific Power Co. and Carson-Truckee Water Dist.
 D. Brian McKay, Atty. Gen., William E. Isaeff, Deputy Atty. Gen., Carson City, Nev., Harold Swafford, John Hoffman, Bowen, Swafford & Hoffman, Reno, Nev., for the State of Nev.
 F. Henry Habicht, II, Peter Steenland, Jr., Kirk D. Snel, Albert M. Ferlo, Jr., Washington, D.C., for Clark.
 Michael Thorp, Eisenhower, Carlson, Newlands, Reha & Quinn, Tacoma, Wash., Robert S. Pelcyger, Fredericks & Pelcyger, Boulder, Colo., for Pyramid Lake Paiute Tribe.
 An Appeal from the United States District Court for the District of Nevada.
 Before DUNIWAY, Senior Circuit Judge, PREGERSON, and NORRIS, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 The Carson-Truckee Water Conservancy District and Sierra Pacific Power Company (appellants) sought a declaratory judgment that the Secretary of the Interior (Secretary) violated the Washoe Project Act, 43 U.S.C.A. Secs. 614-614d (West 1964), and related reclamation laws in refusing to sell water from the Stampede Dam and Reservoir on the Little Truckee River for municipal and industrial (M & I) use in Reno and Sparks. In addition, Nevada sought a determination that the Secretary was required to obtain a permit from the Nevada State Engineer to operate the Stampede Dam in California. The Pyramid Lake Paiute Tribe of Indians (Tribe) intervened in support of the Secretary. We affirm in part and vacate in part.
 
 
 2
 I. Factual Background and District Court Decisions
 
 
 3
 A detailed recitation of the relevant facts may be found in the district court's two opinions. Carson-Truckee Water Conservancy District v. Watt (Carson-Truckee I), 537 F.Supp. 106 (D.Nev.1982); Carson-Truckee Water Conservancy District v. Watt (Carson-Truckee II), 549 F.Supp. 704 (D.Nev.1982). The Little Truckee River flows into the Truckee River, which then flows from California into Nevada and into Pyramid Lake. Stampede Dam is located on the Little Truckee in California. The Secretary now operates Stampede Dam in a way that conserves two species of fish, the cui-ui fish and Lahontan cutthroat trout, that are protected under the Endangered Species Act (ESA), 16 U.S.C. Secs. 1531-1543 (1982). See Carson-Truckee I, 537 F.Supp. at 109; Carson-Truckee II, 549 F.Supp. at 710-11. Appellants concede that the Secretary's obligations under ESA supersede his obligations under the Washoe Project Act and related federal reclamation laws. Carson-Truckee II, 549 F.Supp. at 708. Appellants, however, challenge the extent of the Secretary's obligations under ESA.
 
 
 4
 The district court bifurcated the issues. In Carson-Truckee I, the district court held that (1) plaintiffs have standing to challenge the Secretary's operation of the dam, (2) plaintiffs have a private right of action to enforce the Secretary's obligations under the Washoe Project Act, (3) M & I use is a "beneficial purpose" for which the Secretary is authorized to sell the project's water under the Washoe Project Act, 43 U.S.C.A. Sec. 614, (4) the Secretary is required to sell water from Stampede Dam not needed to fulfill his trust obligations to the Tribe and his obligations under ESA, and (5) the Secretary does not need a Nevada state water permit for Stampede Dam's present operation in California.
 
 
 5
 After deciding Carson-Truckee I, the district court received evidence on the question of how much water was required to fulfill the Secretary's obligations under ESA and on an alternate plan, submitted by appellants to the Secretary, for operation of the dam. The parties submitted direct evidence in the form of written expert testimony. The parties then were afforded the opportunity to fully cross-examine the experts.
 
 
 6
 After the hearing, the district court, in Carson-Truckee II, ruled that (1) ESA required the Secretary to give priority to conserving the cui-ui fish and Lahontan cutthroat trout so long as they were endangered and threatened, and (2) the Secretary's finding that there was no excess water to sell after fulfilling those statutory obligations was supported by substantial evidence and therefore his operation of Stampede Dam was neither arbitrary nor capricious. The court also found that appellants' proposed alternate plan for the operation of the dam would jeopardize the fish and that the Secretary did not abuse his discretion in rejecting the plan.
 
 II. Analysis
 
 7
 We affirm and adopt all but one of the district court's holdings for the reasons ably stated by Judge Solomon in his two learned opinions. The one holding we vacate is the court's ruling in Carson-Truckee I that the Washoe Project Act obligates the Secretary to sell all water from Stampede Dam that remains after he has fulfilled his obligations under ESA and under the Tribe's reserved water rights.[1] Carson-Truckee I, 537 F.Supp. at 112-13. The following analysis assumes a familiarity with the district court's opinions.
 
 
 8
 (a) Obligation to sell water
 
 
 9
 We agree with the district court's conclusion that M & I use is a "beneficial purpose" for which the Secretary is authorized to sell the project's water, Carson-Truckee I, 537 F.Supp. at 112. We do not necessarily agree, however, that the Secretary is obligated to sell the water for M & I purposes simply because those purposes are the only present uses for which the Secretary can obtain some reimbursement for project costs.
 
 
 10
 Reclamation projects funded by the federal government are generally intended to be reimbursed through the sale of project water. See, e.g., 43 U.S.C. Sec. 485h(a) (1982) (Secretary must submit findings on the amount of costs that will "probably be repaid by water users" before construction expenditures for a given project may be made). The district court held that Congress had anticipated that the Washoe Project would be 86% reimburseable. Carson-Truckee I, 537 F.Supp. at 111. But circumstances have changed. Although Congress in passing the Washoe Project Act intended that irrigation was the Act's primary purpose, irrigation is no longer a viable use of the project. Appellants are the only entities that seek to distribute the water for reimburseable purposes. Thus, they argue that the Secretary must sell the project's water to them.
 
 
 11
 The Washoe Project Act, however, unlike other reclamation project authorizations, did not prohibit the Secretary from constructing the project until repayment contracts for the project had been entered into. Compare San Angelo Project Act Sec. 2(b), 43 U.S.C.A. Sec. 615p(b) (West 1964) (Secretary must enter into contracts for repayment of project costs before constructing project) with Washoe Project Act Sec. 2(b)-(c), 42 U.S.C.A. Sec. 614a(b)-(c) (Secretary must enter into repayment contracts before delivering water). The Washoe Project Act merely prohibits the Secretary from delivering project water for reimburseable uses without first obtaining a repayment contract. See Washoe Project Act Sec. 2(a), 43 U.S.C.A. Sec. 614a(a) (federal reclamation laws govern Secretary's construction, operation, and maintenance of Washoe project); 43 U.S.C. Sec. 485h(c) (1982) (section of federal reclamation law governing sale of reclamation project water for M & I use).
 
 
 12
 Because we affirm the district court's holding that, under ESA, the Secretary is permitted to use at this time all of the project's water to conserve the two species of fish, we need not resolve the extent of the Secretary's obligation to obtain reimbursement for the project in the future. The Secretary's asserted obligation to sell project water for M & I purposes should be considered when his superseding obligations to the Tribe, see supra note 1, and under ESA have been fulfilled. Accordingly, we vacate the district court's opinion on this narrow point.
 
 
 13
 (b) Appellants' arguments
 
 
 14
 We feel constrained to elaborate our reasons for rejecting appellants' arguments against two of the district court's holdings. Those holdings are that (1) ESA requires the Secretary to give priority to the conservation of threatened and endangered species, and (2) the Secretary did not abuse his discretion both in determining that there was no excess water to sell for M & I purposes after his obligations under ESA were fulfilled, and in rejecting appellants' alternate plan for operating Stampede Dam. Our comments address specific arguments raised on appeal. We make them only to supplement the district court's reasoning.
 
 
 15
 (1) ESA's requirements.
 
 
 16
 Appellants urge a reading of ESA that would lead to a result at odds with the statute's clearly stated objectives. Appellants contend that the Secretary's authority is defined solely by ESA Sec. 7(a)(2), 16 U.S.C. Sec. 1536(a)(2).[2] Thus, they argue that the Secretary is authorized only to take actions that avoid "jeopardizing" the continued existence of a species. Appellants contend that the Secretary may not do more than that.
 
 
 17
 In addition to its Sec. 7(a)(2) "jeopardy" provision, however, ESA also directs the Secretary to conserve threatened and endangered species to the extent that they are no longer threatened or endangered. Appellants, relying solely on Sec. 7(a)(2), would have us ignore the other sections of ESA directly applicable here and relied on by the district court. Carson-Truckee II, 549 F.Supp. at 708-10. ESA Sec. 2(b), (c), & Sec. 3(3), 16 U.S.C. Sec. 1531(b), (c), & Sec. 1532(3).[3] ESA Sec. 7(a)(1), moreover, specifically directs that the Secretary "shall" use programs administered by him to further the conservation purposes of ESA. 16 U.S.C. Sec. 1536(a)(1).[4] Those sections, as the district court found, direct that the Secretary actively pursue a species conservation policy. See also Tennessee Valley Authority v. Hill, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978) (ESA requires the Secretary to give highest priority to the preservation of endangered species; Congress intended to "haltand reverse the trend toward species extinction, whatever the cost." (emphasis added)).
 
 
 18
 The purpose of ESA Sec. 7(a)(2) is to ensure that the federal government does not undertake actions, such as building a dam or highway, that incidentally jeopardize the existence of endangered or threatened species. See TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 for an example of Sec. 7(a)(2)'s application. Contrary to appellants' contention, ESA Sec. 7(a)(2) is inapplicable here because the Secretary has not undertaken a project that threatens an endangered species. Instead, following the mandate of ESA Sec. 7(a)(1), Sec. 2(b), (c), & Sec. 3(3), 16 U.S.C. Sec. 1536(a)(1), Sec. 1531(c), (b), & Sec. 1532(3), the Secretary actively seeks to conserve endangered species. Thus, the district court properly applied ESA Sec. 2(b), (c), & Sec. 3(3) rather than ESA Sec. 7(a)(2) to this case.
 
 
 19
 Applying the proper code sections to this case, the Secretary's decision is well-justified. The Washoe Project Act anticipates but does not require the Secretary to sell water to recover project construction costs. See supra pp. 741 F.2d at pp. 260 - 261. ESA, on the other hand, directs the Secretary to use programs under his control for conservation purposes where threatened or endangered species are involved. Following this directive, the Secretary here decided to conserve the fish and not to sell the project's water. Given these circumstances, the ESA supports the Secretary's decision to give priority to the fish until such time as they no longer need ESA's protection.[5]
 
 
 20
 (2) Abuse of Discretion
 
 
 21
 In addition to challenging the extent of the Secretary's obligations under ESA, appellants presented the Secretary with a proposed alternate plan under which they maintained he could both conserve the fish and sell water for M & I use. The plan included planting miles of shade trees along the river to reduce water temperature, confining the river to a single channel, and constructing fish hatcheries. The district court found that appellants' proposed alternate plan would jeopardize the fish. He then held that the Secretary had not abused his discretion in rejecting the plan and in determining that he had no excess water to sell for M & I purposes after fulfilling his obligations under ESA. The district court's holding is based in part upon findings of fact about the spawning requirements of the cui-ui fish and Lahontan cutthroat trout. Carson-Truckee II, 549 F.Supp. at 711.
 
 
 22
 Appellants raise two objections to the district court's holding. First, appellants contend that, although a district court's factual determinations are usually reviewed under a clearly erroneous standard, the nature of the hearing conducted by the district court in this case warrants a less deferential standard of review. Appellants assert that the hearing before the district court was a "paper hearing," in which the demeanor and credibility of the expert witnesses was not involved. Second, they maintain that the district court was clearly erroneous in any event because its decision, which affirmed the Secretary's rejection of appellants' proposed plan, was based on a finding that appellants' plan would result in a constant river temperature of 68 degrees. The fish cannot reproduce in water that warm.
 
 
 23
 Neither argument persuades us to reach a different result. Although the district court required that expert testimony be submitted in writing, the experts were cross-examined in the court's presence. And, even if we were to employ a less deferential standard of review, we nonetheless would affirm the district court on its overall holding that the Secretary did not abuse his discretion.
 
 
 24
 The 68 degree finding is found in a brief footnote in the district court's opinion. Carson-Truckee II, 549 F.Supp. at 711 n. 9. The district court's holding does not stand or fall with that finding. Even assuming that the district court's 68 degree finding was clearly erroneous,[6] we think the district court's other findings--for example, that (1) appellants did not meet their burden of showing that the Secretary abused his discretion, (2) it is not feasible to operate Stampede Dam for both M & I and fishery purposes, and (3) appellants' plan would require the expenditure of huge sums, thereby defeating the purpose of obtaining reimbursement, Carson-Truckee II, 549 F.Supp. at 711-12--amply support the court's approval of the Secretary's action.
 
 
 25
 The judgment is AFFIRMED in part and VACATED in part.
 
 
 
 [1]
 We do not consider the Secretary's obligation to provide water to the Tribe for the reasons given by the district court in Carson-Truckee II, 549 F.Supp. at 712-13
 
 
 [2]
 Section 7(a)(2) states in pertinent part:
 Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical ....
 16 U.S.C. Sec. 1536(a)(2) (1982).
 
 
 [3]
 Section 2(b) states the purposes of ESA:
 The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species ....
 16 U.S.C. Sec. 1531(b).
 Section 2(c) states in pertinent part:
 [A]ll Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.
 16 U.S.C. Sec. 1531(c).
 Section 3(3) defines "conserve":
 The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.
 16 U.S.C. Sec. 1532(3).
 
 
 [4]
 Section 7(a)(1) states in pertinent part:
 The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species ....
 16 U.S.C. Sec. 1536(a)(1).
 
 
 [5]
 Because we hold that the Washoe Project Act does not require the Secretary to sell water for M & I use, we need not reach the question whether, given competing mandatory statutory directives, the Secretary would be required to use the project's water entirely for conservation purposes under ESA Sec. 2(b), (c), Sec. 3(3), & Sec. 7(a)(1). Similarly, because the Secretary actively seeks to use the project for conservation purposes, we need not consider the extent of his affirmative obligations under ESA Sec. 2(b), (c), Sec. 3(3), & Sec. 7(a)(1) had he decided neither to sell the water nor to protect the fish
 
 
 [6]
 The court noted that the appellants' plan would result in a constant river temperature of 68 degrees. Such a temperature renders it too hot for the fish to reproduce successfully. Appellants point out that the evidence introduced before the district court indicated that appellants' plan--planting miles of shade trees, dredging the channel, and undertaking other measures--would result in occasional, not constant, 68 degree river temperatures. The district court may therefore have erroneously reported appellees' expert's testimony