**UNITED STATES of America, Plaintiff,**

v.

**GLENN–COLUSA IRRIGATION DISTRICT, Defendant.**

**No. Civ. S–91–1074 DFL JFM.**

United States District Court, E.D. California.

March 10, 1992.

George L. O'Connell, U.S. Atty., Edmund F. Brennan, Asst. U.S. Atty., Sacramento, Cal., Barry M. Hartman, Acting Asst. Atty. Gen., Environment and Natural Resources Div., James C. Kilbourne, Eileen Sobeck, Larry J. Bradfish, Attys., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Paul R. Minasian, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER GRANTING PERMANENT INJUNCTION

LEVI, District Judge.

This case arises from a long-standing dispute between the Glenn–Colusa Irrigation District (the "District") and federal and state authorities responsible for the preservation of marine life. The National Marine Fisheries Service (the "Service") brought this action to protect the Sacramento River winter-run chinook salmon (the "winter-run salmon"), a species designated by the Secretary of Commerce as threatened under the Endangered Species Act. The United States now moves for an injunction prohibiting the District from taking fingerling salmon in the course of pumping water from the Sacramento River at its Hamilton City, California pumping station.

At this juncture, on the motion for injunction, the case is straightforward with few relevant disputes of fact. There is no dispute that the Endangered Species Act, and the actions of the Secretary of Commerce in designating the winter-run salmon as threatened, prohibit the taking or harming of any winter-run salmon. There is no dispute that the winter-run salmon is threatened, and in fact close to extinction— from a population in the tens of thousands only some twenty years ago to fewer than 200 adult winter-run salmon returning to the Sacramento river to spawn in 1991. There is no dispute that the District's Hamilton City pumping station and the associated fish screen [1] kill and harm the winter-run salmon.

The matters which are most vigorously disputed are not now properly before the court. First, the terms on which the District could continue pumping despite some incidental harm to the salmon are not at issue because the District has not applied for an incidental take permit and has not contested the Service's incidental take statement issued in connection with the District's application for a dredging permit. Second, responsibility for the design, construction, and cost of a new screen is not now before the court. The question on the motion for injunction is not whether the District or the California Department of Fish and Game should pay for a new screen but whether the District may continue its pumping activities with the current screen in place.

In short, at this point, the only questions before the court are whether the winter-run salmon is protected under the Endangered Species Act and whether the District's pumping irreparably harms the species in violation of federal law. If so, an injunction must issue. The District's attack on the federal and state regulatory agencies is premature and irrelevant to the

---

1. The fish screen is a large screen spanning the opening of the District's diversion channel designed to prevent fish from entering the District's pump intakes.

resolution of the motion for injunction now ready for decision.

## BACKGROUND

The District was organized in 1920 to provide irrigation water to farms located in Glenn and Colusa Counties in California. The District obtains the water for its customers from the Bureau of Reclamation through a contract which permits it to divert 720,000 acre-feet of water from the natural flow of the Sacramento River. The flow of the Sacramento River is diverted into an oxbow channel at the District's Hamilton City pumping facility. During the peak irrigation season from April to October, the District's diversions from the river range from 300 to 2900 cubic feet per second with an average rate of 2,000 cubic feet per second. At certain times nearly one third of the river flow may be diverted by the District.

The problems caused to marine life in the river by the District's diversion are long-standing. In response to an order of the California Board of Fish and Game Commissioners (the "Commission") in 1920, the District installed a fish screen to prevent the fish from being drawn into the District's pumps. That screen washed away during the next spring's floods. In 1929, the Commission determined that 67% of the food and game fish below the District's pumping operation were dead or damaged. The State of California sued the District and obtained an injunction compelling the District to install a fish screen meeting the Commission's requirements or to cease operating the pumping facility. *See People v. Glenn–Colusa Irrigation District*, 127 Cal.App. 30, 33, 15 P.2d 549 (1932). In 1935, the District complied with the injunction and installed a fish screen. Within three years, however, floods undermined the screen, rendering it useless. The District did nothing to repair or replace it, and the situation continued unabated until the California Department of Fish and Game

stepped in and installed a new screen in 1972.[2] *Final Feasibility Report, GCID/ CDF & G Fish Protection and Gradient Restoration Facilities*, 1–4 (Nov. 1989), Exhibit 4 to plaintiff's Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Plaintiff's TRO & PI").

This case focusses on the effect of the District's current pumping activities on the anadromous [3] Sacramento River winter-run chinook salmon (the "winter-run salmon"). This is a distinct species of salmon found only in the Sacramento River. The winter-run salmon population is comprised of three year-classes of salmon. The first year class of winter-run salmon fry begins its seaward migration down the Sacramento River in late July or early August and reaches the ocean in early spring of the following year. Three years later the now adult surviving salmon return to the Sacramento River to spawn and then die.

In 1966, the California Department of Fish and Game began conducting official counts of the returning adult winter-run salmon at the Red Bluff Diversion Dam. These counts demonstrate that the population of winter-run salmon declined 97% between 1967–69 and 1982–84, from 84,000 to 2,000 for the respective years. The winter-run salmon population declined further in recent years, until in 1989 only 547 adult winter-run salmon returned to spawn, in 1990 only 441 returned, and in 1991 only 191 returned. A population of 400 to 1,000 fish is needed to maintain the genetic diversity of the species. Thus, the species is close to extinction.

It has been estimated that the District's pumping operation killed approximately 800,000 to 9,100,000 fingerling chinook salmon annually prior to 1972 when the California Department of Fish and Game installed the present fish screen at the District's pumping operation. P. Ward, *A Re-*

---

**2.** Apparently the fish screen was built with funds from both state and federal sources.

**3.** An anadromous fish is one which "spawns or is artificially produced in freshwater, reaches

mature size while rearing in salt water, and returns to freshwater to reproduce." *See United States v. Washington*, 384 F.Supp. 312, 405 (W.D.Wash.1974).

*view and Evaluation of the Losses of Migrant Juvenile Chinook salmon at the Glenn–Colusa Irrigation District Intake* 1 (Dec. 1989), attachment to the Declaration of Paul Ward, Exhibit 3 to Plaintiff's TRO & PI. Even with the fish screen, estimates of lost juvenile chinook salmon range from 400,000 to 10,000,000 annually. *Id.* The winter-run salmon approaching the District's diversion face several perils. When the District is pumping more than 1,100 feet per second, the screen approach velocity exceeds the California standard causing the winter-run salmon to be pinned or battered against the screens by the current. The screen approach velocity also increases as the water level or elevation decreases because the water needed to satisfy the draw of the District's pumps must pass through a smaller area of the screen. This condition contributes to screen approach velocities in excess of the state standard. When the screen approach velocity exceeds the state standard, some winter-run salmon are so small that they are drawn directly into the mesh of the screen becoming entrained. Others are trapped against or under the screens where they are easily preyed on by predators. In addition, the District's diversion channel is a prime aquatic habitat for predators causing additional losses of salmon.

State and federal agencies have taken steps to protect the dwindling numbers of Sacramento river winter-run salmon. The Secretary of Commerce designated the winter-run salmon a threatened species first by emergency regulation and later by duly adopted regulation effective November 5, 1990. 55 Fed.Reg. 46515 (November 5, 1990) amending 50 C.F.R. § 227.21.[4] The regulation invoked 16 U.S.C. § 1533(d), which permits the Secretary of Commerce to prohibit, among other things, any taking of the winter-run salmon.

In July 1986 the District applied to the Army Corps of Engineers for an extension to its permit to dredge its diversion channel. A number of state and federal agencies opposed the extension of the permit

unless the District commenced fish protection measures. On March 7, 1988, the Army Corps of Engineers issued an interim dredging permit which expired in December 1989. The permit was conditioned upon the District's agreement to conduct fish and hydrologic studies that would aid in the development of a long-term solution to the fish passage problems at the District's pumping facility. The permit also required the District to enter into a 1987 Memorandum of Understanding with the California Department of Fish and Game. In November 1989, the District released a report summarizing fish mortality problems and proposing several solutions. The Service, the United States Fish and Wildlife Service and the California Department of Fish and Game endorsed the report's preferred alternative which called for the building of a new fish screen.

In December 1989, the District applied for a new dredging permit from the Army Corps of Engineers. By the time of this application, however, the winter-run salmon had been listed as threatened under the emergency provisions of the Endangered Species Act. The Act required the Army Corps of Engineers to consult with the Service concerning the District's application for a dredging permit. *See* 16 U.S.C. § 1536. The Service determined that issuance of the District's dredging permit was likely to jeopardize the winter-run salmon in violation of the Endangered Species Act. *See Biological Opinion of the National Marine Fisheries Service to U.S. Army Corps of Engineers Regarding Public Notice No. 8900254, Glenn–Colusa Irrigation District,* issued May 28, 1991, Exhibit 6 to Plaintiff's TRO & PI. The Opinion did indicate that the harm could be avoided if the District constructed a new fish screen. The Opinion also included an incidental take statement providing that a permit could issue to the District, allowing continued pumping, if an effective new fish screen were installed. An incidental take permit would allow the District to take

**4.** California listed the winter-run chinook salmon as an endangered species under the California Endangered Species Act, in August 1989.

salmon, incidentally to their pumping operation. The Army Corps of Engineers has not issued the dredging permit at this time, and the District has not accepted or challenged the incidental take statement.

On December 3, 1990, the Service notified the District that without an incidental take permit, the District was liable for incidental takings of the winter-run salmon under the Endangered Species Act.[5] The District never applied for an incidental take permit. Further negotiations between the District and the Service were unsuccessful. On August 9, 1991, the United States filed this action and was granted a temporary restraining order. The parties stipulated to the terms of a preliminary injunction which the court ordered.

## ANALYSIS

### A. The Endangered Species Act

The Endangered Species Act was instituted to conserve endangered [6] and threatened [7] fish and wildlife species through federal action and coordination with state programs.[8] A species is identified as threatened or endangered by the Secretary of Commerce or the Secretary of the Interior after consideration of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). This determination must be made on the basis of the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A).

The Act prohibits any person from taking, possessing, selling, importing, exporting or transporting a protected species. The Act also provides for identification of a critical habitat for each species and adoption of regulations which will conserve and enhance the population of the species. 16 U.S.C. § 1533(b)(2) and (d).

In this matter, the United States asserts that the District's pumping facility "takes" the winter-run salmon. Under the Endangered Species Act "take" means "to harass, harm, pursue, hunt, capture, shoot, wound, kill, trap, capture or collect or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).[9] However, the Secretary may permit a taking of a protected species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). The application for such

5. Alternatively the District could comply with the incidental take statement prepared by the Service as part of its consultation with the Army Corps of Engineers concerning the District's dredging permit. 16 U.S.C. § 1536.

6. A species is endangered under the Endangered Species Act if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

7. A species is threatened under the Endangered Species Act if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). As noted previously in text, the Secretary invoked his authority under 16 U.S.C. § 1533(d) to apply the same protection to the winter-run salmon as if it had been designated as endangered rather than threatened. Section 1533(d) provides that "[t]he Secretary may by regulation prohibit with respect to any threatened species any [taking, im-

portation or exportation, possession, sale, transportation or delivery]" of the species.

8. The stated purpose of the Endangered Species Act is to

"provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions"

to which the United States has pledged itself in the international community. 16 U.S.C. § 1531(b).

9. California's definition of taking uses nearly identical language to the definition in federal law. California law defines "take" to mean "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture or kill." Cal. Fish & Game Code § 86 (West 1984).

an incidental take permit must contain a conservation plan that specifies—

    (i) the impact which will likely result from such taking;

    (ii) the steps the applicant will take to minimize and mitigate such impacts and the funding that will be available to implement such steps;

    (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

    (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(a)(2)(A). If the Secretary finds the plan satisfactory after opportunity for public comment, and determines that the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild, the Secretary shall issue the permit on the terms and conditions deemed appropriate. *Id.*

Violation of the Act's prohibition on taking is subject to civil and criminal penalties. 16 U.S.C. § 1540(a) and (b). Moreover, the Act specifically provides for injunctive relief: "the Attorney General of the United States may seek to enjoin any person who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." 16 U.S.C. § 1540(e)(6).

In considering whether an injunction should issue under the Endangered Species Act, the court must determine whether the United States has an adequate remedy at law and whether the injury to the salmon is irreparable. The Supreme Court has indicated that the "language, history, and structure" of the Endangered Species Act "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978). Congress "foreclosed the exercise of traditional equitable discretion by courts" faced with a taking under

the Endangered Species Act. *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir. 1987). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable. If such injury is sufficiently likely" an injunction will issue. *Amoco Production Co. v. People of the Village of Gambell,* 480 U.S. 531, 546, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). Congress has decided that any possible expense and inconvenience to the public cannot equal the potential loss from extinction. *Sierra Club,* 816 F.2d at 1386 n. 13.

    ■   Thus, the the court must determine whether defendant Glenn–Colusa is violating a substantive or procedural provision of the Endangered Species Act and whether injury to the salmon is likely and irreparable; if so, the United States is entitled to an injunction. *Sierra Club,* at 1384.[10] The District invites the court to engage in a "detailed analysis of the mechanisms and a consideration of the social utility of ordering" the District to cease taking winter-run salmon. In light of the clear authority cited above, the court declines the District's invitation. Such an analysis and weighing of competing considerations is precluded by the Act and has already been undertaken by Congress.

The Secretary of Commerce has determined by duly adopted regulation that the winter-run salmon is a threatened species.[11] The final regulation regarding the winter-run salmon invoked the Secretary's authority to accord a threatened species the protections of an endangered species. The regulation provides that "the prohibitions of section 9 of the Act (16 U.S.C. § 1538) relating to endangered species apply to the Sacramento River winter-run chinook salmon ..." unless an incidental take permit is granted.

---

**10.** These cases deal with violations of section 7 rather than section 9. However, the prohibitive language in section 9 is at least as unambiguous as that in section 7. Both sections evidence Congress' intent that the balance of equities and hardships tip in favor of the endangered species.

**11.** The District does not contend that the designation by the Secretary of the winter-run salmon as threatened was improper or in any way invalid.

There is no genuine question that a taking—harming or killing—of winter-run salmon is occurring at the District's pumping station in violation of the Endangered Species Act. Rather, the District argues first, that the taking is caused by the fish screen, owned by the California Department of Fish and Game, and not by the District's pumping. Second, the District asserts that enforcement is premature since the Service has not yet determined the critical habitat of the winter-run salmon nor adopted regulations conserving the species, and has failed to comply with the National Environmental Protection Act ("NEPA").

## B. *The Cause and Responsibility for the Taking of Salmon*

■ The District now urges this court to find that the fish screen, rather than the pumping, causes the taking of winter-run salmon. The court does not agree.

It is undisputed that the District's pumping harms fish in the absence of a fish screen. However, as the history previously recited demonstrates, the District has been recalcitrant to its duty under California law to protect salmon and other fish in the river. Only after the District's repeated failure to maintain an operating fish screen, despite orders stretching back to the 1920's by the California Board of Fish and Game Commissioners and the state courts, did the California Department of Fish and Game step in and install a fish screen in 1972. Unfortunately, this fish screen is not now effective to protect the migrating winter-run salmon fry. As previously discussed, the winter-run salmon fry may be impinged on the screen, entrained through the screen or fall prey to predation by other fish in the District's diversion channel. Moreover, it is undisputed that winter-run salmon fry which safely negotiate their way through the screen, are "taken" by the District's pumps. During the 1991 migration, fyke nets downstream from the District's pumps recovered winter-run salmon fry.[12]

■ The screen itself presents no hazard to the salmon. It is because of the pumping that the screen is needed and that the screen becomes hazardous because of the force exerted by the District's pumps. The primary activity is pumping and not "fish screening" and the fish screen is present to mitigate the effects of the District's pumping. In short, it is because of the pumping that the screen exists and it is because of the District's stubborn resistance to its obligations that the California Department of Fish and Game undertook to install the screen. The District's argument that it may shift to the State all responsibility under federal law for any taking is at least brash, in light of the history, but also absurd for it is the pumping that creates the taking.[13]

■ Of course, the District may have certain remedies against the California Department of Fish and Game. Under state law it may—although it apparently has not done so—contest the design, maintenance or repair of the fish screen. *See* Cal.Fish and Game Code §§ 5981 and 5990. But the remedies the District may have under state law against the California Department of the Fish and Game do not absolve it from its responsibility under federal law to avoid any taking of the winter-run salmon. The District has an independent responsibility to refrain from taking an endangered species, quite aside from the allocation of responsibility under California law for maintenance of the fish screen or protection of fish in general.

■ The District alternatively encourages the court to adopt the California definition of the proximate cause of a taking rather than federal common law. It asserts that if the court applies California's definition of proximate cause, it will find the California Department of Fish and

---

**12.** The District even denies responsibility for this taking, claiming the California Department of Fish and Game is responsible for installing finer mesh screens or blocking the gaps through which the winter-run salmon fry may pass.

**13.** It is irrelevant whether the taking is direct or indirect. *See Palila v. Hawaii Dept. of Land & Natural Resources,* 639 F.2d 495 (9th Cir.1981).

Game, rather than the District, responsible for taking winter-run salmon. The District's reasoning is suspect on two grounds. First, the District provides no authority for the proposition that California law is applicable to interpret a federal statute that applies in all states. It is doubtful that Congress intended that the Endangered Species Act would apply differently in different states depending on state law definitions of proximate cause. Moreover, even under California law, the District does not prevail on the causation issue. The California Supreme Court recently has held that the test for causation is whether the defendant's conduct was a "substantial factor" in bringing about the injury. *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872 (1991). It can not be disputed that the draw from the District's pumps is a substantial factor causing the taking of winter-run salmon.

■ Similarly, the District argues that the definition of "taking" in the Endangered Species Act should be interpreted to incorporate state law. The District asserts, without support, that California's law of takings holds responsible only persons who have the power and authority to correct the taking. The term "taking" is defined in the Endangered Species Act and in California law in nearly identical terms. *See* footnote 6 *supra* and associated text. The District argues that Congress intended to integrate the federal and state law protecting endangered species, and therefore the state law definition of taking should be applied. However, to the extent that California's law on taking is less protective than the Endangered Species Act, it is preempted.[14] Moreover, under either state or federal law, the District has taken and will take winter-run salmon when they are killed because of the operation of its pumps. Certainly, the District has the power and authority over the operation of its own pumps.

■■ Finally, in the same vein, the District argues that state water law rights should prevail over the Endangered Species Act. The Act provides that federal agencies should cooperate with state and local authorities to resolve water resource issues regarding the conservation of endangered species. 16 U.S.C. § 1531(c)(2). This provision does not require, however, that state water rights should prevail over the restrictions set forth in the Act. Such an interpretation would render the Act a nullity. The Act provides no exemption from compliance to persons possessing state water rights, and thus the District's state water rights do not provide it with a special privilege to ignore the Endangered Species Act. Moreover, enforcement of the Act does not affect the District's water rights but only the manner in which it exercises those rights.

## C. Enforcement of the Act is Not Premature

■■ The District asserts that the Endangered Species Act, read as a whole, logically requires that enforcement occur only after a critical habitat is designated, a recovery plan is developed, and protective regulations are adopted. The recovery plan required by the Act constitutes a framework for action directed at the conservation or survival of the species, and Congress has specified some of the items the plan must discuss. 16 U.S.C. § 1533(f)(1)(B). Development of the recovery plan, designation of critical habitat, and implementation of protective regulations may take years. *See* 16 U.S.C. §§ 1533(b)(6)(A), 1533(b)(6)(C). It does not follow that enforcement action must await such agency action. In this case, the winter-run salmon population has declined to a level that threatens the survival of the species. The genetic diversity of the species may be lost while the agency develops a recovery plan and designates critical habitat, if takings are not prohibited now. The

---

**14.** The Endangered Species Act provides in pertinent part:

Any state law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided in this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f).

Endangered Species Act does not expressly condition the enforcement of the prohibition on taking a protected species to takings occurring after the agency adopts a recovery plan, identifies critical habitat or issues protective regulations. The court will not imply such a requirement that could be destructive of the Act's fundamental purpose. Indeed, this very case illustrates that such an interpretation of the Act could render the listing of an endangered or threatened species moot.

▆▆▆▆▆ The District also contends that enforcement of the Endangered Species Act without completion of an environmental impact statement violates the National Environmental Policy Act of 1969 ("NEPA").[15] However, the United States seeks only to enforce compliance with the Endangered Species Act proscription on takings; the effort to enforce compliance is not a major federal action triggering NEPA. *See Calipatria Land Co. v. Lujan,* Civ. No. 90–1185–GT, 1990 WL 361742 (S.D.Cal.1990) (enforcement of Migratory Bird Treaty Act not a major federal action triggering NEPA); 49 Fed.Reg. 29644, 29652 (July 23, 1984) (regulation of the National Oceanic and Atmospheric Administration stating that law enforcement actions are categorically exempt from NEPA). The District's interpretation of the applicability of NEPA would lead to a highly impractical result in which any decision of a law enforcement agency—whether to go forward with an action or forbear from action—would require a NEPA analysis.

### The Injunction Shall Issue

The court concludes that the District is taking winter-run salmon in violation of section 9 of the Endangered Species Act, 16 U.S.C. § 1538, and that neither state or federal law exempts or excuses the District from complying with the Act. Plaintiff's motion for summary judgment is granted.

Plaintiff seeks a permanent injunction preventing the District from further violations of the Endangered Species Act. The court finds that the survival of the winter-run salmon population is jeopardized by the District's activities, and that these activities present a danger of irreparable harm to a species on the verge of extinction. The Act provides that injunctive relief is proper to prevent irreparable harm to the winter-run salmon. Accordingly, the court hereby enjoins the District from pumping water from the Sacramento River at its Hamilton City facility during the winter-run chinook salmon's peak downstream migration season of July 15 through November 30 of each year.

The court pauses to note that there is no unfairness in this injunction. The District has failed to contest the design, maintenance or repair of the screen to the California Department of Fish and Game, under the procedures provided by law. Cal. Fish and Game Code § 5981 and 5990. It has not applied for an incidental take permit from the Service and has failed to pursue its application for a dredging permit with the Army Corps of Engineers. If these permits were denied or issued upon conditions which the District believed to be arbitrary or capricious, the District would have further recourse against the agency's actions. The fundamental dispute between the District and the Service is not whether winter-run salmon are taken when the District pumps water, but what the cure for the taking will be. The Service favors a new fish screen; the District asserts that repairs and modifications to the existing fish screen together with dredging will suffice. These issues, however, are not before the court now and will not be until the District applies for an incidental take permit or follows up on its dredging permit application with the Army Corps of Engineers.

The District shall inform the court by February 21, 1992, whether it intends to

---

15. The court notes that the district court's decision in *Mobil Oil Corp. v. FTC,* 430 F.Supp. 855 (S.D.N.Y.1977), upon which defendant relies heavily, was reversed by the Second Circuit. *Mobil Oil Corp. v. FTC,* 562 F.2d 170 (2nd Cir.

1977) (holding that an environmental impact statement is required under NEPA in an FTC adjudicatory proceeding, if at all, only at the remedial stage.)

comply with or challenge the incidental take statement issued pursuant to its application for a dredging permit from the Army Corps of Engineers or has completed a written application for an incidental take permit under 16 U.S.C. § 1539. Upon the District's report to the court on February 19, 1992, the court will consider modifications to its order, including the government's request for a reporting requirement and a contempt schedule as well as the District's request to use an indexing system that relates the amount of pumping to the numbers of salmon fry present at the pumping station.

IT IS SO ORDERED.