**LOGGERHEAD TURTLE** (Caretta caretta), Green Turtle (Chelonia mydas), Leatherback Turtle (Dermochelys coriacea), Shirley Reynolds and Rita Alexander, Plaintiffs,

v.

The **COUNTY COUNCIL OF VOLUSIA COUNTY, FLORIDA,** a political subdivision of the State of Florida and **Bruce Babbitt,** in his official capacity as Secretary of the United States Department of the Interior, an agency of the United States of America, Defendants.

No. 6:95–cv–587–Orl–22B.

United States District Court,
M.D. Florida,
Orlando Division.

March 24, 2000.

Peter J.B. Zies, Zies Brothers, P.A., Maitland, Lesley Gay Blackner, Law Office of Lesley Blackner, Palm Beach, FL, for Loggerhead Turtle, (Caretta caretta), Green Turtle, (Chelonia mydas), Shirley Reynolds, Rita Alexander, Leatherback Turtle, (Dermochelys coriacea), plaintiffs.

Jeffrey D. Keiner, John A. Kirst, Jr., Charles W. Sell, Theodore L. Shinkle, Russell S. Kent, Gray, Harris & Robinson, P.A., Orlando, Jamie Ellen Seaman, Daniel D. Eckert, Volusia County Legal Department, Deland, I. Randall Gold, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, Mark A. Brown, Wildlife & Marine Resources Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for the County Council of Volusia County, Florida, Bruce

Babbitt, Secretary of the United States Department of Interior, defendants.

## ORDER

CONWAY, District Judge.

### I. Introduction.

Congress has found that various species of fish, wildlife, and plants in the United States have been so depleted in numbers that they are in danger of or threatened with extinction. *See* 16 U.S.C. § 1531(2). Because these particular species are deemed to have "esthetic, educational, historical, recreational, and scientific value to the Nation and its people," the United States has pledged itself to conserve them, to the extent practicable. To fulfill this pledge, in 1973, Congress enacted the Endangered Species Act ("the ESA" or "the Act") in an attempt to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, (1978).[1] The Act sets forth a comprehensive plan whereby endangered and threatened species and the ecosystems upon which they depend may be preserved. *See* 16 U.S.C. § 1531 *et seq.; see also,* e.g., *Pacific Rivers Council v. Thomas,* 936 F.Supp. 738 (D.Idaho 1996); *Palila v. Hawaii Dept. of Land and Natural Resources,* 649 F.Supp. 1070 (D.Haw.1986), *aff'd,* 852 F.2d 1106 (9th Cir.1988).

Once again, the Court is called upon to apply the Act's protections to three species of sea turtles[2] which nest on the shores of Volusia County, Florida: the Leatherback sea turtle (*Caretta caretta*) and Green sea turtle (*Chelonia mydas*), both endangered,[3] and the Loggerhead sea turtle

---

1. The Supreme Court has described the Endangered Species Act as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

2. The original action involved the Loggerhead and Green turtles only. After remand from

the Eleventh Circuit, the Plaintiffs amended their complaint to include the Leatherback turtle as well.

3. An "endangered species" is a species which is in danger of extinction throughout all or a significant portion of its range. *See id.* § 1532(6).

(*Dermochelys coriacea*), whose extinction is threatened.[4] The Loggerhead, Green, and Leatherback sea turtles, along with Rita Alexander and Shirley Reynolds (collectively "the Plaintiffs"), move this Court to preliminarily enjoin Defendant, County Council of Volusia County, Florida ("Volusia County") from "permitting" all artificial light sources that harm the sea turtles on Volusia County beaches during their nesting season. Plaintiffs and Volusia County have also filed cross-motions for summary judgment on this issue.

On March 20, 2000, the Court held a hearing on all pending motions, at which representatives for the Plaintiffs, Volusia County, and the Secretary of the Interior were present.[5] Having considered the parties' arguments and submissions, and for the reasons set forth below, the Court concludes that Plaintiffs' motion for preliminary injunction is due to be denied. As to Count 1 of the Second Amended Complaint, which addresses only Volusia County's liability in connection with the artificial beachfront lighting issue, the County is entitled to summary judgment.

## II. Procedural and factual history.

On June 8, 1995, Plaintiffs filed this action contemporaneously with their first

motion for preliminary injunction, which sought two forms of relief to prevent the "taking"[6] of sea turtles on Volusia County beaches. Plaintiffs' claims centered around Volusia County's beach-related ordinances regarding lighting and vehicular access, which Plaintiffs believed posed an immediate danger to the Loggerhead and Green sea turtles. To remedy the alleged harm, Plaintiffs asked the Court to enjoin Volusia County from permitting vehicular traffic on the beach and to compel the County to enforce—throughout the entire county—Florida's "Model Lighting Ordinance for Sea Turtle Protection," instead of the county ordinance then currently in effect.

The artificial beach lighting ordinance in effect at that time, entitled "Minimum Environmental Standards for Sea Turtle Protection,"[7] was calculated to minimize the artificial light on the beaches by implementing lighting restrictions in three categories: 1) lights associated with new development; 2) lights associated with existing development; and 3) lights that are publicly owned. The ordinance did not apply county-wide to new development; rather, the law permitted municipalities within the county to submit their own proposed ordinance subject to the county's approval.

---

**4.** A "threatened species" is a species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range. *See id.* § 1532(20).

**5.** In Counts 2, 3, 4, and 5 of the Second Amended Complaint, the Plaintiffs sue the Secretary of the Interior in relation to the incidental take permit (ITP) issued to Volusia County with respect to vehicular traffic on the beach. Because those counts raise wholly distinct issues, and because the Plaintiffs seek to preliminarily enjoin the County only, the Court will address the claims against the Secretary of the Interior by separate order.

**6.** The Endangered Species Act provides that, "with respect to any endangered species of fish or wildlife ... it is unlawful for any person ... to take any such species." 16 U.S.C. § 1538(a)(1)(B). By federal regulation it is likewise unlawful for any person to take

any species listed as "threatened." *See* 50 C.F.R. § 17.31(a). The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. *See* 16 U.S.C. § 1532(19).

**7.** Volusia County, Fla., Ordinance No. 89–60, § 2 (1989). Volusia County later enacted an artificial beachfront lighting ordinance that exceeded the minimum standards established in Ordinance 89–60, which also was later amended. *See* Volusia County, Fla., Ordinance No. 90–22, § 3 (1990). The Plaintiffs contended that both Ordinance 89–60, as amended, and Ordinance 90–22 were causally connected to the sea turtles' harm. The Plaintiffs posited that even if 90–22 applied county-wide, it was restrictions were too ineffective to prevent takings.

Several municipalities elected this option. In addition, the parts of the ordinance covering existing development and public lighting (from which it was alleged the majority of the harmful lighting emanated) did not apply at all to the cities of Daytona Beach and Daytona Beach Shores, since the County believed that sea turtles would not likely utilize those two areas for nesting.

## A. The Court's August 5, 1995 Order.

On August 5, 1995, this Court entered an order on Plaintiffs' first motion for preliminary injunction. *See Loggerhead Turtle v. County Council of Volusia County*, 896 F.Supp. 1170 (M.D.Fla.1995). As to the beachfront driving issue, the Court enjoined Volusia County from permitting private vehicles upon its beaches at night and from permitting vehicles to drive and park within the "conservation zone." [8]

As to the artifical lighting issue, the Court found that the Plaintiffs lacked standing to sue Volusia County for takes that had occurred within the non-party

municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach, because those municipalities, albeit located within the County, had supplemental authority to regulate and/or independently enforce their own artificial beachfront lighting restrictions.[9] Importantly, the Court further opined that Volusia County's then-existing lighting ordinance, which applied throughout the unincorporated areas and the Town of Ponce Inlet, did not, in and of itself, violate the Endangered Species Act.

## B. Dismissal of the action.

At the time the preliminary injunction was issued, Volusia County had pending an application for an "incidental take permit" pursuant to 16 U.S.C. § 1539,[10] which, in essence, would allow Volusia County to "take" some sea turtles as a result of beach driving. As explained in the margin, a person seeking an incidental take permit ("ITP") must propose measures to minimize and mitigate, to the maximum extent practicable, the impacts of such taking. In this case, as part of the permit

8. As part of its Beach Code, Volusia County adopted a "conservation zone," which extended seaward from the dunes for a distance of thirty feet and stretched the entire length of the coastline beach under Volusia County's jurisdiction. The dunes, and thus the "conservation zone," were a variable distance from the ocean waters at different sections of the Volusia County beaches.

9. On July 9, 1996, the Court granted Volusia County's motion for partial summary judgment regarding the County's liability under the ESA for lighting-related takings.

10. Under the "incidental taking" provision of Endangered Species Act, a person may receive a permit to "take" endangered or threatened species. The holder of such a permit is not liable for any taking that falls within the scope of the taking authorized by the Secretary of the Interior. An applicant for a taking permit must apply to the Secretary of the Interior, and submit with the application a conservation plan that specifies (i) the impact that will likely result from the taking; (ii) the steps the applicant will take to

minimize and mitigate such impacts and the funding available for such mitigation; (iii) alternative actions considered and the reasons why they were not used; and (iv) any other measures the Secretary may require as necessary or appropriate. *See* 16 U.S.C. § 1539(a)(2)(A).

After the Secretary publishes a notice of the proposed permit in the Federal Register and the public has been allowed an opportunity to comment upon it, the Secretary may issue an incidental taking permit only upon finding that "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the [conservation] plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) the measures, if any, required [by the Secretary as necessary and appropriate for the purposes of the conservation plan] will be met." *See* 16 U.S.C. § 1539(a)(2)(B).

process, Volusia County agreed to adopt extensive mitigatory measures, including the development of a "Beach Lighting Management Plan," under which the County was required, *inter alia*, to survey every lighting source, study their impacts, and implement methods to correct light sources that misorient sea turtles. On November 21, 1996, Volusia County obtained the permit from the United States Fish and Wildlife Service. Finding that alleged takes in violation of the ESA caused by artificial lighting were within the permit's scope, the Court dismissed the action on December 20, 1996 as to both the beach driving and artificial beachfront lighting issues. Plaintiffs appealed the Court's dismissal and the granting of Volusia County's motion for partial summary judgment on the County's liability for lighting-related takings within the County's incorporated municipalities.

### C. The Eleventh Circuit's opinion: *Loggerhead Turtle v. Volusia County,* 148 F.3d 1231 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1488, 143 L.Ed.2d 570 (1999).

The Eleventh Circuit reversed the district court's dismissal of the case in two relevant respects. First, the Court ruled that the ITP issued to Volusia County which permits takings of sea turtles caused by beach driving does not additionally permit takings caused by artificial lighting. After remand, the issue left for this Court was whether Volusia County could be held liable for the lighting takings occurring in the County's unincorporated areas which fall within the County's direct regulatory control. Second, the appellate court held that the Plaintiffs had standing "to seek to hold Volusia County liable" for harmfully inadequate regulation of artificial beachfront lighting in the non-party municipali-

ties of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach. Again, the lighting issue was remanded for the Court to determine whether Volusia County's lighting ordinance violated the Endangered Species Act.

### D. Volusia County's new standards for sea turtle protection.

Several weeks before the Eleventh Circuit issued its opinion, Volusia County adopted Ordinance 99–12, which sets forth new "Minimum Standards for Sea Turtle Protection." Significantly, 99–12 revised the definition of "sea turtle nesting areas" subject to regulation to include the municipalities of Daytona Beach and Daytona Beach shores.[11] The new ordinance applies to the entire length of Volusia County's beaches, from the Florida State Recreational Area to the north boundary of the Canaveral Seashore.

In addition, Ordinance 99–12 also amended the "adoption of standards by municipalities." This provision now provides that the affected municipalities (Ormond Beach, Daytona Beach, Daytona Beach Shores, and New Smyrna Beach) may either independently adopt and enforce a sea turtle lighting ordinance that meets Volusia County's Minimum Standards for Sea Turtle Protection or elect to authorize the County to enforce the lighting standards within their independent jurisdictions.

At the same time, Volusia County also adopted Ordinance 99–13, amending the Volusia County Land Development Code, Ordinance No. 88–3. The amendment's purpose is "to minimize artificial light illuminating the entire beach of the county ...." Ord. 99–13, § 1203(a). To that end, the County passed new lighting standards for new development (§ 1203), existing de-

---

**11.** As previously noted, the prior ordinance (Ordinance90–22), exempted Daytona Beach and Daytona Beach Shores from sea turtle lighting regulation by defining those municipalities as areas in which sea turtles do not nest.

velopment (§ 1204), and for publicly-owned lighting (§ 1205). The new lighting standards are designed virtually to eliminate beach illumination which may be harmful to the sea turtles' nesting habits. For example, artificial lighting on new development must comply with the following:

(1) Light fixtures shall be designed, positioned, shielded, or otherwise modified such that the source of light and any reflective surfaces of the fixture shall not be directly visible by a person who is in a standing position on the beach.

(2) Lights shall not directly or indirectly illuminate the beach during the sea turtle nesting season.

(3) Tinted glass, or any window film applied to window glass which meet [sic] the shading criteria for tinted glass, shall be installed on all windows of single- or multi-story buildings or structures within line of sight of the beach in the regulated boundaries.

(4) Lights illuminating signs shall be shielded or screened such that they do not illuminate the beach and the source of the light shall not be visible by a person who is in a standing position on the beach.

Ord. 99–13, § 1203(a)(1)(2)(3) & (4).

Lighting standards for existing development similarly prohibit illumination of the beach. While the requirements vary slightly, the provisions governing both new and existing developments are geared toward achieving the same result: to eliminate the negative effects of interior illumination from doors and windows within the line of sight of the beach in the regulated boundaries. Section 1204(a)(6), which speaks to existing development, directs the County's citizens to take the following measures:

a. Apply window tint or film that meets the standard for tinted glass;

b. Rearrange lamps and other moveable fixtures away from windows;

c. Use window treatment (e.g., blinds, curtains) to shield interior lights form the beach; and

d. Turn off unnecessary lights.

*Id.*

To aid in its effectuation, the ordinance requires local governments to develop and implement public education programs directed towards encouraging the management of interior lighting for single- and multi-story buildings or structures. *Id.* § 1204(a)(7). With respect to publicly owned lighting, the ordinance requires streetlights and lighting at parks or other publicly owned beach access points to be "designed, positioned, shielded, or otherwise modified such that they shall not illuminate the beach and the source of the light shall not be visible by a person who is in a standing position on the beach." *Id.* at § 1207. Each of the County's incorporated municipalities has adopted these minimum lighting standards and has opted to allow the County to enforce them within their municipal boundaries.

## III. Standard for Preliminary Injunction.

 As this Court previously announced, the broad language of the Endangered Species Act and the pronouncements of the Supreme Court teach that, in considering the entry of an injunction under the ESA: (1) the Court does not have the "traditional equitable discretion" to balance the parties' interests, (2) any threatened harm is *per se* irreparable harm, and (3) the public interest always favors the imposition of an injunction under the Act. *See, e.g., Tennessee Valley Auth.,* 437 U.S. at 174, 184, 98 S.Ct. 2279; *see also Marbled Murrelet (Brachyramphus Marmoratus) v. Pacific Lumber Co.,* 880 F.Supp. 1343 (N.D.Cal.1995), *aff'd,* 83 F.3d 1060 (9th Cir.1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997) (to prevail in an injunctive proceeding under

the ESA, a plaintiff must show that violation of ESA is at least likely in future, or that a definite threat of future harm to protected species exists). The future threat of even a single taking is sufficient to invoke the authority of the Act. *See Swan View Coalition, Inc. v. Turner*, 824 F.Supp. 923, 938 (D.Mont.1992) (threatened extinction is not necessary for a finding of harm under the ESA).

■ To obtain relief, petitioners seeking a preliminary injunction under the ESA must show: (1) that the wildlife at issue is protected under the Act, and (2) that there is a reasonable likelihood that the defendant will commit future violations of the Act. *See Loggerhead Turtle*, 896 F.Supp. at 1180 (citing *National Wildlife Fed'n v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1510–1511 (9th Cir.1994)).

## IV. The Endangered Species Act's framework.

A summary of the ESA's relevant provisions and framework is appropriate. The United States through the Secretary of the Interior (or of Commerce or Agriculture, as the case may be)[12] is vested with the responsibility of determining whether any species is endangered or threatened because of one of several listed factors, such as destruction of its habitat, disease, predation, or overutilization. *See* 16 U.S.C. § 1533(1). When making such a determination, the Secretary shall concurrently designate whether the habitat of such species is considered to be a "critical habitat." *Id.* § 1533(a)(3)(A). The Secretary shall

develop and implement a "recovery plan" for the conversation and survival of endangered and threatened species, unless he finds that such a plan will not promote the conservation of the species. In so doing, the Secretary may procure the services of appropriate public and private agencies and institutions, and other qualified persons. *Id.* § 1533(f). The Secretary's responsibility under this chapter is farreaching: he "must do far more than merely avoid elimination of the protected species; he must bring such species back from the brink so that they may be removed from the protected class, and he must use all necessary methods to do so." *See Carson–Truckee Water Conservancy Dist. v. Watt*, 549 F.Supp. 704 (D.Nev.1982), *aff'd*, 741 F.2d 257 (9th Cir.1984); *Defenders of Wildlife v. Andrus*, 428 F.Supp. 167 (D.D.C.1977); *Sierra Club v. Clark*, 577 F.Supp. 783 (D.Minn.1984); *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C.Cir. 1980).[13]

The ESA requires the Secretary to cooperate with the States to the maximum extent practicable in carrying out the programs authorized under the Act. *See* 16 U.S.C. § 1535(a). In this respect, the Secretary may enter into agreements with any State for the administration and management of any area established for the conservation of endangered or threatened species. *Id.* § 1535(b). Additionally, the Secretary may enter into cooperative agreements with any State which establishes and maintains an adequate and active program for the conservation of endangered and threatened species. *Id.* at

---

**12.** The Secretary of the Interior is generally responsible for all terrestrial species, while the Secretary of Commerce is responsible for most marine species. *See* 16 U.S.C. § 1533(a)(2). The Fish and Wildlife Service has responsibility for sea turtles during their nesting activities. 50 C.F.R. § 222.23(a). FWS is a branch of the Department of the Interior. Because this action involves sea turtles on the beach, the term "Secretary" herein refers to the Secretary of the Interior.

**13.** To implement his conservation programs, the Secretary is authorized to use the land acquisition authority vested in him by Congress and, in addition to this authority, the Secretary may acquire by purchase, donation, or otherwise, lands, waters, or interest therein, in order to conserve listed species. *See* 16 U.S.C. § 1534(a)(2).

§ 1535(c). The Act details the criteria for determining whether a State program may be deemed "adequate and active." *Id.* The Secretary is authorized to provide financial assistance to any State which has entered into such a cooperative agreement. *Id.* at § 1535(d).

The ESA addresses instances where there may be a conflict between Federal and State laws. This conflict provision provides, in pertinent part, that the Act:

> shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

*Id.* at § 1535(f).

■ To the extent that a state's regulation of "taking" is less protective than the ESA, it is preempted. *See U.S. v. Glenn–Colusa Irr. Dist.,* 788 F.Supp. 1126 (E.D.Cal.1992); *see also State v. Billie,* 497 So.2d 889 (Fla. 2nd DCA 1986), *review denied,* 506 So.2d 1040 (Fla.1987) (ESA preempted state's right to legislate concerning endangered species, but did not specifically preempt state law in conservation area which was more restrictive than ESA or other federal regulations promulgated pursuant thereto.)

## V. Analysis.[14]

■ The Court once already has described the harm which results when artificial lighting interferes with the sea turtles' nesting process. *See Loggerhead Turtle,* 896 F.Supp. 1170 (M.D.Fla.1995). For the convenience of the reader, the Court will again explain the perils sea turtle hatchlings face when artificial light illuminates the County's shores.

The nesting season in Florida for sea turtles begins May 1st and continues until October 31st. During these months the adult female sea turtles come ashore at night to lay their eggs. On the shores of Volusia County's beaches, the sea turtles dig their nests and lay their eggs on the seaward edge of the dunes. The dunes form the western border of the beach, stretching parallel to the shoreline.

After choosing a spot for the nest, the adult female sea turtle digs a shallow cavity in the sand, and lays dozens of eggs into this cavity. The mother sea turtle then covers the eggs with sand and returns to the sea. The adult female sea turtles do not have the maternal instinct to tend or return to their eggs once they have been laid.

In Florida sea turtle eggs incubate for almost two months. After the incubation period, the sea turtle hatchlings break out of their shells. The hatchlings emerge

---

**14.** As a threshold matter, Volusia County argues Plaintiffs' suit is barred by the Eleventh Amendment because the County is an "arm of the state" and is thus entitled to sovereign immunity. It is well-settled that counties do not enjoy Eleventh Amendment immunity from suit in federal court. *See Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (citing *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890)). The one case which Volusia County cites in support of its immunity argument does not even address the Eleventh Amendment. *See McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Moreover, even if Volusia County were an arm of the state, which, for purposes of the Eleventh Amendment, it is not, the Eleventh Amendment does not bar certain actions in federal court against state officers for injunctive or declaratory relief, which is exactly what the Plaintiffs seek here. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

from their sand nest during the night, when they sense the decrease in the temperature of the sand. For the sea turtle hatchlings to survive they must reach the sea soon after emerging from their nest. Under natural conditions, turtle hatchlings escape from the nest, orient themselves toward the sea, and reach the surf within several minutes. The turtle hatchlings instinctively orient themselves seaward by crawling toward the reflection of the night sky off the ocean waters and surf. Experts have concluded that "[t]he principal component of the sea-finding behavior of emergent hatchlings is a visual response to light." *See* National Marine Fisheries Service and U.S. Fish and Wildlife Service, "Recovery Plan for U.S. Population of Green Sea Turtle." National Marine Fisheries Service, Washington, D.C., p. 6 (1991); National Marine Fisheries Service and U.S. Fish and Wildlife Service, "Recovery Plan for U.S. Population of Loggerhead Sea Turtle." National Marine Fisheries Service, Washington, D.C., p. 8 (1991); National Marine Fisheries Service and U.S. Fish and Wildlife Service, "Recovery Plan for Leatherback Turtles (*Demochelys coriacea)* in the U.S. Caribbean, Atlantic, and Gulf of Mexico." National Marine Fisheries Service, Washington, D.C., p. 12 (1992). Failure to reach the sea quickly greatly increases the likelihood that the hatchlings will die from exhaustion, dehydration, or predation from crabs or birds.

## A. Beachfront lighting in Volusia County "harms" protected sea turtles within the ESA's meaning.

The Endangered Species Act provides that, "with respect to any endangered species of fish or wildlife ... it is unlawful for any person ... to take any such species." 16 U.S.C. § 1538(a)(1)(B). By federal regulation it is likewise unlawful for any person to take any species listed as "threatened." *See* 50 C.F.R. § 17.31(a). Congress defined the statutory term "take" to mean: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" has been defined by regulation as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *See* 50 C.F.R. § 17.3. "Harm" has been defined by regulation as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *See id.; see also Marbled Murrelet v. Babbitt,* 83 F.3d 1060 (9th Cir.1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997) (habitat modification which significantly impairs the breeding and sheltering of a protected species amounts to "harm" under the ESA, and "harm," therefore, includes the threat of future harm).[15]

The Court previously found that:

Artificial beachfront lighting significantly increases the incidence of injury to and mortality of sea turtle hatchlings. It is well-established that artificial lighting from buildings, streetlights, beach lamps, and nearby vehicles cause disorientation (loss of bearing) and misorientation (incorrect bearing) in sea turtle hatchlings.

The effects of disorientation or misorientation are frequently fatal. Turtle hatchlings crawl toward the alternative

---

**15.** As explained in footnote 10, *supra,* Section 10 of the ESA provides an exception to the Section 9 take prohibition by allowing the Secretary to issue an incidental take permit to a nonfederal entity authorizing the taking of the endangered species. 16 U.S.C. § 1539(a).

light source or meander along the beach rather than head toward the sea. Hatchlings thereby become entangled in dune vegetation, or may be struck by vehicles after having crawled to nearby roadways. Hatchlings which have successfully navigated their way to the ocean may become misoriented in the surf or the waters just off the shore. Strong artificial lighting may even draw hatchlings out of the surf and back onto the beach. Thus misguided, turtle hatchlings inevitably succumb to exhaustion, dehydration, predators, or the weight of motor vehicles.

Artificial illumination also interferes with the nesting efforts of mother sea turtles. Loggerhead and Green sea turtles abort nesting attempts with greater frequency in areas with bright beachfront lights.

*Loggerhead Turtle,* 896 F.Supp. at 1174–75. When the parties were before the Court in 1995, the Court found evidence that "overwhelmingly supports the conclusion that artificial beachfront lighting harms and harasses the sea turtles within the meaning of the Endangered Species Act." More specifically, the Court found evidence that decidedly favored the conclusion that artificial lighting is responsible for the "taking" of these sea turtles on the beaches of Volusia County. *See id.* at 1180–81.

Almost five years later, the harm to the sea turtles continues. Plaintiffs present sufficient evidence demonstrating that artificial beachfront lighting continues to "take" turtles within the ESA's meaning. Among the supporting submissions is the affidavit of Beth Libert, president of the Volusia Turtle Patrol, Inc., which states that "[t]he 1999 nesting season is the worst in recorded history for number of lighting disorientations" in her area of jurisdiction on Volusia County beaches. [Libert Aff. ¶ 59.] [16]

The sea turtle "incident reports" appended to Libert's affidavit are telling. They show that from May 7 through August 20, 1999, the Turtle Patrol has documented 52 individual artificial lighting disorientation events on the beach. According to Libert, of the 170 incubating nests under her jurisdiction in August 1999, 60 were in areas known to disorient because of lighting. The first half of the 1999 season produced a record number of sea turtle nests on Volusia County beaches and a record number of documented lighting-related disorientations through August 21, 1999. The Plaintiffs note that this record season for lighting harm occurred despite the fact that the ITP the United States Fish & Wildlife Service granted to Volusia County on November 21, 1996 includes a "Beachfront Lighting Management Plan" designed to ameliorate the harmful effects artificial light sources have on protected sea turtles on Volusia County beaches. Although the ITP and the plan were in effect for over two years when the 1999 sea turtle season began, substantial number of takings of protected sea turtles continue to occur in Volusia County in violation of the ESA. Volusia County does not dispute that artificial lighting on the beach has caused the above-catalogued takings. [17]

**B. Volusia County's sea turtle protection ordinance does not cause harm to sea turtles.**

■ At this juncture, it is clear that: 1) endangered and threatened sea turtles in

---

**16.** Libert has been permitted by the State of Florida to monitor turtle activities in Volusia County for the past 16 years. She has been the principal marine turtle permit holder for the area from the North Peninsula State Recreation Area south to the Ponce de Leon Inlet for the past seven years. In 1999, the Florida Department of Environmental Protection (which is now known as the Florida Fish and Wildlife Conservation Commission or "FFWCC") expanded Libert's permit responsibility to include the area from the north boundary of Gamble Rogers State Recreation Area to 10th Street in Flagler Beach.

**17.** Although the Leatherback turtles was recently added as a Plaintiff, there is no dispute that the artificial beach lighting harms the Leatherback in the same manner as it does the Green and Loggerhead turtles.

Volusia County are "taken" in violation of the ESA; and 2) these takings result from artificial beachfront lighting. Plaintiffs urge the Court to hold Volusia County responsible for these takings. Count 1 of Plaintiffs' Second Amended Complaint asserts that the County is in violation of section 9(a)(1)(B), the ESA's takings prohibition, *see* 16 U.S.C. § 1538(a)(1)(B), because the County's *affirmative* acts of adopting and enforcing an ineffective artificial beachfront lighting ordinance are a proximate cause of the harm to and mortality of sea turtles. Plaintiffs move the Court to enjoin Volusia County from "authorizing" such lighting each year during the sea turtle nesting season. Volusia County admits that it regulates artificial lighting, but contends that it does not *permit* beach lighting which harms the turtles.

Plaintiffs have sued Volusia County under the ESA's citizen suits' provision, which states:

(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), *who is alleged to be in violation* of any provision of this chapter or regulation issued under the authority thereof . . . .

16 U.S.C. § 1540(g) (emphasis added). In order to provide the requested relief, the Court must first find that Volusia County's actions have in some way violated the ESA. With respect to artificial beachfront lighting, there is simply no evidence to support the imposition of ESA liability on the County.

Volusia County's charter requires the County Council to establish minimum standards for environmental protection. *See*

Volusia County, Fla., Home Rule Charter, Art. II, § 202.4 (1989). Volusia County first adopted provisions seeking to establish sea turtle protection in 1989. Ten years later, the County promulgated even more stringent ordinances aimed at protecting the sea turtles which nest and hatch on its shores. As part of its sea turtle protection scheme, the County enacted Ordinance 99–13, which comprehensively regulates artificial beachfront lighting in order to "minimize artificial light illuminating the entire beach of the county . . . ." There is no dispute that Volusia County exclusively regulates artificial beach lighting throughout the County, since the County is the only governmental entity exercising beach lighting regulatory authority within its boundaries. [Def.'s Motion for Partial Summ. J. at ¶ 3.]

Plaintiffs rely on the Eleventh Circuit's *Loggerhead* opinion to support their position. That decision simply is not applicable to this case. First, the Plaintiffs' cause of action regarding the lighting issue under the original complaint was based on an ordinance which has since been amended. Second, the Eleventh Circuit addressed the issue of standing only; that is, whether Plaintiffs had standing to sue the County for lighting-related harm which may have been caused by independent, incorporated municipalities within the County's boundaries. The Eleventh Circuit found that Plaintiffs had shown a sufficient causal connection *to seek to hold* the County liable for harmfully inadequate regulation as to the non-party municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach, and New Smyrna Beach, since the county charter grants the authority and "arguably a duty" to establish minimum environmental standards. *Loggerhead Turtle*, 148 F.3d at 1249. The Eleventh Circuit left questions of "proximity and degree" and the "standard for causation for . . . liability" for resolution by this court. *Id.* at 1252 & n. 24. In other words,

as Volusia County correctly argues, the Eleventh Circuit did not find that the County's prior lighting ordinance caused sea turtle takings. Questions of causation were clearly reserved for this Court to determine on remand.

The Court must visit anew whether Volusia County's *current* lighting ordinance *causes* the type of harm violative of the ESA's takings provision. Volusia contends that its regulatory scheme acts to prohibit, restrict, and limit artificial beachfront lighting, not to authorize, entitle, or legitimize it. The Court agrees.

Volusia County contends that its ordinance does not permit an act otherwise unlawful, *cf. Defenders of Wildlife v. Administrator, Environmental Protection Agency,* 882 F.2d 1294, 1300–01 (8th Cir. 1989), or license an act in expressly a manner likely to result in an ESA violation, *cf. Strahan v. Coxe,* 127 F.3d 155, 163–64 (1st Cir.1997). In fact, the County's specifically drafted its sea turtle ordinance to be consistent with the ESA. Section 50–254 of the ordinance states, in part:

**Relation to Endangered Species Act.**

(a) This division is adopted for the purpose of implementing the provisions of section 202.4 of the Charter to provide protection for sea turtles as a matter of local policy. It is the intent of the county that this division be consistent with, and in furtherance of, the provisions of the Endangered Species Act, 16 U.S.C. §§ 1531 through 1544, and that it satisfy any obligation the county may have under the act to prevent harm to sea turtles by its election to adopt this regulation. There are no definitive standards regarding artificial lighting. The county has used as a guide the state's model lighting ordinance; [18] followed the nest-

ing season dates established by the state; and sought the advice of appropriate federal officials and subject matter experts.

*Id.* Plaintiffs' theory of the case rests upon the assertion that, since Volusia County voluntarily regulates beach lighting, it is responsible for the ESA-violative conduct of its residents under an "implied permission" theory. This contention is without merit. The fact is, Volusia County's ordinance *does ban* artificial lighting on the beach. Plaintiffs' case is not based upon the County's failure to enforce the sea turtle protection ordinance, nor do Plaintiffs contend that an alleged failure to enforce the ordinance would violate the ESA. In any event, the County has presented evidence that it does, in fact, enforce its beach lighting ordinance. *See* Aff. of Carol Kerrigan (Doc. 202).

The Plaintiffs want Volusia County to cease enforcing "harmfully" inadequate lighting regulations. Although Plaintiffs deny that they want the Court to compel the County to adopt an even *more* "turtle-friendly" ordinance (because that would raise a separation of powers conundrum), whether they admit it or not, that is the only remedy that would satisfy their complaint. Plaintiffs wish to hold the County liable for takings because its beach residents are are not turning off their lights in compliance with the ordinance. This the Court is unwilling to do.

In its previous order addressing Volusia County's prior lighting ordinance, the Court concluded that:

[t]he Plaintiffs have not presented the Court with any legal authority by which the Court has the power to tell the County to pass and enforce a specific piece of legislation. Volusia County's lighting ordinance does not violate, in

---

18. In its original action, Plaintiffs proposed that the Court issue an injunction compelling the County to enforce county-wide Florida's

"Model Lighting Ordinance for Sea Turtle Protection."

and of itself, the Endangered Species Act. If it did, the Court could strike the ordinance down by authority of the Supremacy Clause. But by what authority may the Court compel the County to enforce a proposed item of local legislation? It may be that the Endangered Species Act vests such power in a federal court. This Court, however, will not exercise such authority without guidance from the higher courts.

*Loggerhead Turtle,* 896 F.Supp. at 1181. This analysis is equally applicable to the new ordinance under present scrutiny. In this Court's reading of the Eleventh Circuit's opinion, the appellate court has not spoken to the contrary.

Congress imposed upon federal agencies the responsibility for implementing and enforcing the Act. The Act authorizes the Secretary of the Interior to enter into management and cooperation agreement with the States, whose participation in conservation programs the Act encourages. The Act requires no affirmative conservation action by states or local governments. The Act neither compels nor precludes local regulation; it preempts that which is in conflict.[19] Volusia County cannot be made to assume liability for the act of its private citizens merely because it has chosen to adopt regulations to ameliorate sea turtle takings.[20] Such an anomalous result would frustrate the intent and purpose of the Act's cooperative agreement provisions. Accordingly, the Court finds that Volusia County has not violated the Endangered Species Act by enacting and enforcing its Minimum Standards for Sea Turtle Protection.

## VI. Conclusion.

Unfortunately, even under Volusia County's stringent lighting ordinance, the artificial illumination of the County's shores continues to harm the sea turtle hatchlings. In addition, there is reason to believe that the harm will continue. The Court truly is sympathetic to the plight of the turtle hatchlings and the sea turtle population in general. However, it is the Court's obligation to apply the law. Thus far, the Court has done everything it is permitted to do to provide relief. This Court is only empowered to enjoin *violators* of the Act from taking the sea turtles. The question presented here is whether Volusia County's ordinance, which is aimed at protecting the turtles, violates the Act by causing takings thereunder. The answer is no. The true violators, the persons responsible for illuminating the beaches, are not before this Court.

This is not to say that the takings cannot be remedied. As Volusia County notes, the recovery plans for each of the Plaintiff sea turtles contemplate that, where local regulations are inadequate or nonexistent, federal lighting regulations will be adopted.[21] While no federal lighting regulations exist, in this case, the County enacted its artificial beachfront lighting ordinance under the Fish and Wildlife Service's imprimatur, in connection with the incidental take permit issued by the Secretary to the County in 1996.

---

19. Plaintiffs do not argue that the ESA preempts the County's ordinance. While it is true that to the extent a state's regulation of "taking" is less protective than the Act, it is preempted; *see U.S. v. Glenn–Colusa Irr. Dist.,* 788 F.Supp. 1126 (E.D.Cal.1992); such preemption is inapplicable here since the Secretary has not promulgated a lighting ordinance to which the County's can be compared.

20. Because the Court is denying the Plaintiffs' request for injunctive relief under the ESA, it need not address the County's arguments that the Fifth and Tenth Amendments bar such relief.

21. *See* Section 2144 of both the Loggerhead (p. 29) and Green turtle (p. 23) plans, [ Exs. C & D of the original complaint] and section 2133 (p. 25) of the Leatherback plan. [Doc. 198, Ex. D].

On November 26, 1997, the County submitted a Beach Lighting Management Plan in accordance with the ITP's requirements. The plan, which is designed to minimize the impact of lighting on sea turtles over a five year period, contemplated that the County would encourage adoption of county-wide lighting ordinances. In 1998, the Fish and Wildlife Service accepted the plan.

In January 1999, the County Council established as a high priority the adoption of a new minimum standard for sea turtle protection. It held numerous public hearings and workshops with beachfront cities, representatives of environmental groups, regulated persons, and other interested parties. The County's Environmental and Natural Resources Advisory Committee invited and heard from Sandra McPherson, the National Sea Turtle Coordinator of the United States Fish and Wildlife Service, and Dr. Blair Witherington of the Florida Marine Research Institute, who is Plaintiffs' expert in this action. [Aff. of Kintner, Doc. 203, at ¶ 4.]

The County's ITP mandates that the County hire a Protected Species Specialist (PSS). The County's PSS, Robert G. Ernest, is responsible for developing many of the tools, programs, and policies currently used to manage and monitor sea turtle conservation activities on county beaches. Ernest, who possesses 25 years of professional experience working throughout Florida's marine and coastal ecosystems, holds the opinion that Volusia County's sea turtle protection program is now "the most comprehensive and complex program of its kind in the United States." [Ernest Aff. at ¶¶ 2,09,10.] According to Ernest, the County's new lighting regulations, in its inclusiveness and approach, is now one of the strictest lighting ordinances in Florida. *Id.* ¶ 13(c). In addition, Ernest knows of no other coastal community in the country that dedicates as much resources to light management than does Volusia County. *Id.* ¶ 14.

Thus far, the Plaintiffs, the County, and the Secretary of the Interior, through the Fish and Wildlife Service, have diligently worked together to conserve the turtles. As Ernest has stated, even "[t]he most ambitious light management program in any coastal area where humans conduct commerce and/or occupy lighted structures cannot insure that take of sea turtles will not occur." *Id.* ¶ 16. If Plaintiffs know of a better solution than the one currently in place, they have the opportunity, as they have had in the past, to present it to the Fish and Wildlife Service and the County. The County's ITP regarding vehicular beach access, which includes the beach lighting plan, is due to expire next year. The County and the Service soon will begin the process necessary to put a new ITP in place. During this time, the Plaintiffs and their experts undoubtedly will have an opportunity to suggest any ameliorative changes to the ITP and the County's current sea turtle protection scheme.

Based on the foregoing, it is ORDERED as follows:

1. Plaintiff's Second Motion for Preliminary Injunction (Doc. 189), filed August 30, 1999, is DENIED.

2. Motion for Partial Summary Judgment by Defendant, County Council of Volusia County, Florida (Doc. 197), filed September 30, 1999, is GRANTED.

3. Plaintiffs' Cross Motion for Partial Summary Judgment (as to Defendant Volusia County Council) (Doc. 211), filed December 13, 1999, is DENIED.

4. Plaintiffs' Request for Judicial Notice or, in the Alternative, to Correct Record (Doc. 194), filed September 16, 1999, is DENIED as MOOT.